# EXHIBIT   L

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to:

Commissioner for Patents, USPTO
Attn: Office of Petitions
Crystal Plaza Four, Suite CP4-3C23
2201 South Clark Place
Arlington, VA  22202

On _____ 9/24/03 _____

TOWNSEND and TOWNSEND and CREW LLP

By: _____

PATENT
Attorney Docket No.:  017704-001012US

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Examiner: |
| ELIZABETH D. LIDDY | Art Unit:      2151 |
| Application No.: 10/137,740 | TRANSMITTAL LETTER – |
| Filed:  April 30, 2002 | RESPONSE TO DECISION ON PETITION |
| For: TECHNIQUES FOR CONTROLLING DISTRIBUTION OF INFORMATION FROM A SECURE DOMAIN | |

Commissioner for Patents, USPTO
Attn:  Office of Petitions
Crystal Plaza Four, Suite CP4-3C23
2201 South Clark Place
Arlington, VA  22202

**RECEIVED**

OCT 0 1 2003

OFFICE OF PETITIONS

Sir:

Pursuant to the Decision dated July 24, 2003 on Petitions Under 37 CFR 1.47(b) and 1.137(b), enclosed are the following to be made of record in the above-identified application:

> 1)  Renewed Petition for Revival of an Application for Patent Abandoned Unintentionally Under 37 C.F.R. 1.137(b);

> 2)  Renewed Petition for Filing Patent Application Under 37 C.F.R. 1.47(b): Application by Assignee When a Sole Inventor Refuses to Sign or Cannot Be Found;

ELIZABETH D. LIDDY                                                    PATENT
Application No.: 10/137,740
Page 2

    3)  Declaration of Rueben Ausptiz in Support of Petition for Filing Patent
Application Under 37 C.F.R. 1.47(b):  Application by Assignee When a Sole
Inventor Refuses to Sign or Cannot Be Found;

    4)  Declaration of Michael Weiner in Support of Petition for Filing Patent
Application Under 37 C.F.R. 1.47(b):  Application by Assignee When a Sole
Inventor Refuses to Sign or Cannot Be Found; and

    5)  Copy of original Petition for Revival of Application for Patent Abandoned
Unintentionally and accompanying exhibits.

    The Commissioner is hereby authorized to charge any additional fees associated

with this paper or during the pendency of this application, or credit any overpayment, to Deposit

Account No. 20-1430.

            Respectfully submitted,

            Horace H. Ng
            Reg. No. 39,315

**Customer No. 20350**

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
Tel: 415-576-0200
Fax: 415 576-0300
HHN:jtc

60046903 v1

RECEIVED

OCT 0 1 2003

OFFICE OF PETITIONS

PTO/SB/64 (10-01)
Approved for use through 10/31/2002. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PETITION FOR REVIVAL OF AN APPLICATION FOR PATENT ABANDONED UNINTENTIONALLY UNDER 37 CFR 1.137(b) | Docket Number (Optional) 017704-001012US |
|---|---|

First named inventor: Elizabeth D. Liddy

Application No.: 10/137,740                         Art Unit: 2151

Filed: April 30, 2002                              Examiner: Unassigned

Title: Techniques for Controlling Distribution of information from a Secure Domain

Attention: Office of Petitions
Assistant Commissioner for Patents
Box DAC
Washington, D.C. 20231

NOTE:     If information or assistance is needed in completing this form, please contact Petitions Information at (703)305-9282.

The above-identified application became abandoned for failure to file a timely and proper reply to a notice or action by the United States Patent and Trademark Office. The date of abandonment is the day after the expiration date of the period set for reply in the Office notice or action plus any extensions of time actually obtained.

APPLICANT HEREBY PETITIONS FOR REVIVAL OF THIS APPLICATION

NOTE: A grantable petition requires the following items:
(1)     Petition fee;
(2)     Reply and/or issue fee;
(3)     Terminal disclaimer with disclaimer fee -- required for all utility and plant applications filed before June 8, 1995; and for all design applications; and
(4)     Statement that the entire delay was unintentional.

1. Petition fee
☒ Small entity - fee $650.00 (37 CFR 1.17(m)).  Applicant claims small entity status.  See 37 CFR 1.27.

☐ Other than small entity - fee $_____ (37 CFR 1.17(m))

2. Reply and/or fee

A. The reply and/or fee to the above-noted Office action in the form of Reply to Notice to File Missing Parts including a 37 CFR 1.47(b) Petition
☐ has been filed previously on _____ .
X is enclosed herewith.

B. The issue fee of $ _____
☐ has been paid previously on _____ .
☐ is enclosed herewith.

[Page 1 of 2]

Burden Hour Statement: This form is estimated to take 1.0 hour to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

RECEIVED

OCT 0 1 2003

OFFICE OF PETITIONS

PTO/SB/64 (10-01)
Approved for use through 10/31/2002. OMB 0651-0031
Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

3.  Terminal disclaimer with disclaimer fee

X Since this utility/plant application was filed on or after June 8, 1995, no terminal disclaimer is required.

☐ A terminal disclaimer (and disclaimer fee (37 CFR 1.20(d)) of $_____ for a small entity or $_____ for other than a small entity) disclaiming the required period of time is enclosed herewith (see PTO/SB/63).

4.  STATEMENT. The entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 CFR 1.137(b) was unintentional. [NOTE: The United States Patent and Trademark Office may require additional information if there is a question as to whether either the abandonment or the delay in filing a petition under 37 CFR 1.137(b) was unintentional (MPEP 711.03(c), subsections (III)(C) and (D))].

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

| | |
|---|---|
| _6/27/03_ | _(signature)_ |
| Date | Signature |

Telephone
Number: (415)576-0200

Horace H. Ng, Reg. No . 39,315

Typed or printed name

Townsend and Townsend and Crew LLP
Two Embarcadero Center
8th Floor
San Francisco, CA 94111
Address

Enclosures: ☒ Fee Payment
   ☒ Reply
   ☐ Terminal Disclaimer Form
   ☐ Additional sheets containing statements establishing unintentional delay
   ☐ Other

---

**CERTIFICATE OF MAILING OR TRANSMISSION [37 CFR 1.10]**

I hereby certify that this correspondence is being:

X deposited with the United States Postal Service on the date shown below with sufficient postage as "Express Mail Post Office to Address" in an envelope addressed to: Assistant Commissioner for Patents, Box DAC, Washington, D.C. 20231.

☐ transmitted by facsimile on the date shown below to the United States Patent and Trademark Office at (703) 308-6916.

| | |
|---|---|
| _6-27-03_ | _Julie Taylor Clough_ |
| | Signature |
| Date | Julie Taylor Clough |
| | Typed or printed name of person signing certificate |

[Page 2 of 2]

SF 1457190 v1

I hereby certify that this correspondence is being deposited with the United
States Postal Service as first class mail in an envelope addressed to:
Commissioner for Patents, USPTO
Attn: Office of Petitions
Crystal Plaza Four, Suite CP4-3C23
2201 South Clark Place
Arlington, VA 22202

On _____ 9/24/03 _____

TOWNSEND and TOWNSEND and CREW LLP

By: _____

PATENT

Attorney Docket No.: 017704-001012US

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Art Unit:       2151 |
| Elizabeth D. Liddy | RENEWED PETITION FOR REVIVAL OF AN APPLICATION FOR PATENT ABANDONED UNINTENTIONALLY UNDER 37 C.F.R. 1.137(b) |
| Application No.: 10/137,740 | |
| Filed: April 30, 2002 | |
| For: TECHNIQUES FOR CONTROLLING DISTRIBUTION OF INFORMATION FROM A SECURE DOMAIN | |

**RECEIVED**

OCT 0 1 2003

OFFICE OF PETITIONS

Commissioner for Patents, USPTO
Attn: Office of Petitions
Crystal Plaza Four, Suite CP4-3C23
2201 South Clark Place
Arlington, VA 22202

Sir:

Assignee of the above-referenced subject application, Technology Innovations, LLC ("Technology Innovations"), hereby submits this Renewed Petition (no fee) under 37 C.F.R. §1.137(b) in order to request revival of the above-referenced application.

<u>Prior 37 C.F.R. §1.137(b) Petition and Decision</u>

A 37 C.F.R. §1.137(b) Petition in connection with the above-referenced application was previously submitted on June 27, 2003.

A Decision on Petition was mailed on July 24, 2003.

Elizabeth D. Liddy                                                                    <u>PATENT</u>
Application No.: 10/137,740
Page 2

<u>Renewed 37 C.F.R. §1.137(b) Petition</u>

In response to the Decision on Petition issued on July 24, 2003, Assignee hereby submits this Renewed 37 C.F.R. §1.137(b) Petition.

A copy of the previously filed 37 C.F.R. §1.137(b) Petition is submitted herewith as part of this Renewed 37 C.F.R. §1.137(b) Petition for consideration.

A Renewed 37 C.F.R. §1.47(b) Petition is also submitted herewith as part of this Renewed 37 C.F.R. §1.137(b) Petition.

It is reiterated that the entire delay in filing the required reply or a proper oath or declaration from its due date until the filing of a grantable petition pursuant to 37 C.F.R. 1.137(b) was unintentional.

<u>Required Fee</u>

Pursuant to the Decision on Petition, no fee is required since this Renewed 37 C.F.R. §1.137(b) Petition is submitted within two months of the mailing date of the Decision on Petition. In the event that any fees are required, the Commissioner is hereby authorized to charge any additional fees associated with this paper or during the pendency of this application, or credit any overpayment, to Deposit Account No. 20-1430.

<u>Conclusion</u>

It is respectfully submitted that the requirements for a petition under 37 C.F.R. §1.137(b) have been satisfied and, therefore, this Renewed Petition should be granted. If there are any questions concerning the foregoing, please do not hesitate to contact the undersigned at (415)576-0200.

Respectfully submitted,

Horace H. Ng
Reg. No. 39,315

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
Tel: (415) 576-0200
Fax: (415) 576-0300
HHN60043791 v1

RECEIVED

OCT 0 1 2003

OFFICE OF PETITIONS

I hereby certify that this correspondence is being deposited with the United
States Postal Service as first class mail in an envelope addressed to:

Commissioner for Patents, USPTO

Attn:  Office of Petitions

Crystal Plaza Four, Suite CP4-3C23

2201 South Clark Place

Arlington, VA  22202

On _____ 9/24/03 _____

TOWNSEND and TOWNSEND and CREW LLP

By: _____

PATENT

Attorney Docket No.: 017704-001012US

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

    Elizabeth D. Liddy

Application No.:  10/137,740

Filed:  April 30, 2002

For:  TECHNIQUES FOR
CONTROLLING DISTRIBUTION OF
INFORMATION FROM A SECURE
DOMAIN

Art Unit:        2151

DECLARATION OF REUBEN AUSPITZ
IN SUPPORT OF PETITION FOR FILING
PATENT APPLICATION UNDER 37 CFR
§ 1.47(b): APPLICATION BY ASSIGNEE
WHEN A SOLE INVENTOR REFUSES
TO SIGN OR CANNOT BE FOUND

Commissioner for Patents, USPTO
Attn:  Office of Petitions
Crystal Plaza Four, Suite CP4-3C23
2201 South Clark Place
Arlington, VA  22202

**RECEIVED**

OCT 0 1 2003

OFFICE OF PETITIONS

Sir:

    I, Reuben Auspitz, declare as follows:

    1.    By way of my direct interest in Manning & Napier Associates, LLC, I am a co-owner of Textwise Company, LLC ("Textwise Company").

    2.    On behalf of Textwise Company, I am submitting this declaration in support of the Petition for Filing Patent Application Under 37 U.S.C. §1.47(b) when a sole inventor refuses to sign or cannot be found.

    3.    In my capacity as a co-owner of Textwise Company, I have knowledge relating to Textwise Company matters, including, the above-referenced subject application and dealings with Technology Innovations, LLC ("Technology Innovations").

4.      In 2002, Technology Innovations and Textwise Company entered into a Purchase Agreement, which, by its terms, transferred the entire right, title and interest in the above-referenced subject application to Technology Innovations. A copy of the Purchase Agreement executed between Technology Innovations and Textwise Company is attached as Exhibit 1 to the Declaration by Technology Innovations.

5.      The instant claimed invention as described in the subject application is covered by the subject matter of the Purchase Agreement. As shown in the official PTO Filing Receipt attached hereto as Exhibit A, the subject application is a continuation of U.S. Patent Application No. 09/942,027 filed on August 28, 2001, which in turn is a continuation of U.S. Patent Application No. 09/699,288 filed on October 26, 2000, which in turn is a nonprovisional application of and claims priority to U.S. Provisional Patent Application No. 60/161,792 filed on October 27, 1999.

6.      The instant claimed invention as described in the subject application is based on the GUARD-IT project. The GUARD-IT project is further described in the Proposal attached as Exhibit 2 to the Declaration of Technology Innovations.

7.      The GUARD-IT project as described in the Proposal was conceived, formulated and pursued by Textwise Company.

8.      Elizabeth D. Liddy participated in the GUARD-IT project and made the instant claimed invention while employed by Textwise Company as an employee subject to the Amended Employment Agreement executed between Textwise Company and Elizabeth D. Liddy (the "Amended Employment Agreement") (identified as Exhibit 3 attached to the Declaration of Technology Innovations). Work performed by Elizabeth D. Liddy for Textwise Company pursuant to the Amended Employment Agreement included subject matter covered by the subject application and such work is governed by Section 6(c) of the Amended Employment Agreement.

9.      As shown in Sections K and L of the Proposal, it is clear that the sole inventor, Elizabeth D. Liddy, of the subject application was an employee of Textwise Company.

Elizabeth D. Liddy                                                          <u>PATENT</u>
Application No.: 10/137,740
Page 3

10.     Michael Weiner was the Chairman of Textwise Company at the time the Amended Employment Agreement was executed between Textwise Company and Elizabeth D. Liddy.

11.     The undersigned declares further that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true and further that these statement made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the subject application or any patent issuing thereon.

Respectfully submitted,

Reuben Anspitz
Date: 9/24/03

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
Tel: (415) 576-0200
Fax: (415) 576-0300
HHN
11457193 v1

RECEIVED

OCT 0 1 2003

OFFICE OF PETITIONS

 UNITED STATES PATENT AND TRADEMARK OFFICE    *017704-001012 US SBK*

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

| APPLICATION NUMBER | FILING DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | DRAWINGS | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|---|
| 10/137,740 | 04/30/2002 | 2151 | 0.00 | 017704-001012US | 6 | 55 | 4 |

CONFIRMATION NO. 4159

20350
TOWNSEND AND TOWNSEND AND CREW, LLP
TWO EMBARCADERO CENTER
EIGHTH FLOOR
SAN FRANCISCO, CA 94111-3834

FILING RECEIPT

|||||||||||||||||||||||||||||||||||||||||||||||
*OC000000008227515*

Date Mailed: 06/04/2002

Receipt is acknowledged of this nonprovisional Patent Application. It will be considered in its order and you will be notified as to the results of the examination. Be sure to provide the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION when inquiring about this application. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please write to the Office of Initial Patent Examination's Filing Receipt Corrections, facsimile number 703-746-9195. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections (if appropriate).**

**Applicant(s)**
Elizabeth D. Liddy, Syracuse, NY;

**Assignment For Published Patent Application**
TEXTWISE LLC, Syracuse, NY;

**Domestic Priority data as claimed by applicant**
THIS APPLICATION IS A CON OF 09/942,027 08/28/2001
WHICH IS A CON OF 09/699,288 10/26/2000
WHICH CLAIMS BENEFIT OF 60/161,792 10/27/1999
AND IS A CIP OF 09/280,228 03/29/1999 PAT 6,263,335
WHICH IS A CON OF 08/795,658 02/06/1997 PAT 6,076,088
WHICH CLAIMS BENEFIT OF 60/011,369 02/09/1996
AND CLAIMS BENEFIT OF 60/015,512 04/16/1996

RECEIVED

OCT 0 1 2003

OFFICE OF PETITIONS

**Foreign Applications**

**If Required, Foreign Filing License Granted** 06/03/2002

**Projected Publication Date:** Request for Non-Publication Acknowledged

**Non-Publication Request:** Yes

**Early Publication Request:** No

**\*\* SMALL ENTITY \*\***

**Title**

Techniques for controlling distribution of information from a secure domain

**Preliminary Class**

709

---

# LICENSE FOR FOREIGN FILING UNDER
## Title 35, United States Code, Section 184
## Title 37, Code of Federal Regulations, 5.11 & 5.15

### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Office of Export Administration, Department of Commerce (15 CFR 370.10 (j)); the Office of Foreign Assets Control, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

### NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

RECEIVED

OCT 0 1 2003

OFFICE OF PETITIONS

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to:

Commissioner for Patents, USPTO

Attn: Office of Petitions

Crystal Plaza Four, Suite CP4-3C23

2201 South Clark Place

Arlington, VA  22202

On _____9/24/03_____

TOWNSEND and TOWNSEND and CREW LLP

By: _____

PATENT

Attorney Docket No.: 017704-001012US

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

    Elizabeth D. Liddy

Application No.: 10/137,740

Filed:  April 30, 2002

For:  TECHNIQUES FOR CONTROLLING DISTRIBUTION OF INFORMATION FROM A SECURE DOMAIN

Art Unit:    2151

DECLARATION OF MICHAEL WEINER IN SUPPORT OF PETITION FOR FILING PATENT APPLICATION UNDER 37 CFR § 1.47(b): APPLICATION BY ASSIGNEE WHEN A SOLE INVENTOR REFUSES TO SIGN OR CANNOT BE FOUND

Commissioner for Patents, USPTO
Attn:  Office of Petitions
Crystal Plaza Four, Suite CP4-3C23
2201 South Clark Place
Arlington, VA  22202

**RECEIVED**

OCT 0 1 2003

OFFICE OF PETITIONS

Sir:

    I, Michael Weiner, declare as follows:

    1.    I am submitting this declaration in connection with the above-identified subject application in support of the Petition for Filing Patent Application Under 37 U.S.C. §1.47(b) when a sole inventor refuses to sign or cannot be found.

    2.    I was the Chairman of Textwise Company, LLC ("Textwise Company") at its founding and at the time Elizabeth D. Liddy, the sole inventor of the subject application, signed the Amended Employment Agreement executed between Textwise Company and Elizabeth D. Liddy (the "Amended Employment Agreement") (identified as Exhibit 3 attached to the Declaration of Technology Innovations).

3.      I executed the Amended Employment Agreement on behalf of Textwise Company. The signature that appears underneath the Textwise Company signature block in the Amended Employment Agreement is my signature.

4.      In my capacity as the Chairman of Textwise Company, I had firsthand personal knowledge relating to projects that Textwise Company was engaged in, including the GUARD-IT project. The instant claimed invention as described in the subject application is based on the GUARD-IT project. The GUARD-IT project is further described in the Proposal attached as Exhibit 2 to the Declaration of Technology Innovations.

5.      The GUARD-IT project as described in the Proposal was conceived, formulated and pursued by Textwise Company.

6.      Elizabeth D. Liddy participated in the GUARD-IT project and made the instant claimed invention while employed by Textwise Company as an employee subject to the Amended Employment Agreement. Work performed by Elizabeth D. Liddy for Textwise Company pursuant to the Amended Employment Agreement included subject matter covered by the subject application and such work is governed by Section 6(c) of the Amended Employment Agreement.

7.      As shown in Sections K and L of the Proposal, it is clear that the sole inventor, Elizabeth D. Liddy, of the subject application was an employee of Textwise Company.

PATENT

Elizabeth D. Liddy
Application No.: 10/137,740
Page 3

8.    The undersigned declares further that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true and further that these statement made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the subject application or any patent issuing thereon.

Respectfully submitted,

Michael Weiner
Date: _____9/24/03_____

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
Tel: (415) 576-0200
Fax: (415) 576-0300
HHN
60043785 v1

"Express Mail" Label No. _E . 330856355_
Date of Deposit _6-27-03_

PATENT

Attorney Docket No.: 017704-001012US

I hereby certify that this is being deposited with the United States Postal Service "Express Mail Post Office to Address" service under 37 CFR 1.10 on the date indicated above and is addressed to:

Assistant Commissioner for Patents
Attn: Box DAC
Washington, D.C. 20231

By: _Julie Taylor Clough_

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

    Elizabeth D. Liddy

Application No.: 10/137,740

Filed: April 30, 2002

For: TECHNIQUES FOR CONTROLLING DISTRIBUTION OF INFORMATION FROM A SECURE DOMAIN

Art Unit:    2151

PETITION FOR FILING PATENT APPLICATION UNDER 37 CFR § 1.47(b): APPLICATION BY ASSIGNEE WHEN A SOLE INVENTOR REFUSES TO SIGN OR CANNOT BE FOUND

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

    Assignee of the above-referenced subject application, Technology Innovations, LLC ("Technology Innovations"), hereby submits this petition under 37 C.F.R. §1.47(b) as a Reply to the Notice to File Missing Parts issued in connection with the subject application in order to request permission to proceed with prosecution of the subject application.

<u>History of Parent Applications</u>

    The subject application is a continuation of U.S. Patent Application No. 09/942,027 filed on August 28, 2001, which in turn is a continuation of U.S. Patent Application No. 09/699,288 filed on October 26, 2000, which in turn is a nonprovisional application of and claims priority to U.S. Provisional Patent Application No. 60/161,796 filed on October 27, 1999.

Elizabeth D. Liddy                                                    <u>PATENT</u>
Application No.: 10/137,740
Page 2

### §1.63 Declaration

The above-referenced subject application was filed without the requisite executed §1.63 declaration by the sole inventor, Elizabeth D. Liddy, who refuses to sign the §1.63 declaration notwithstanding the fact that she is under contractual obligation to do so.

As permitted under 37 C.F.R. §1.47(b), the requisite §1.63 declaration is executed by Michael Weiner, Chief Executive Officer of Technology Innovations, and submitted herewith as Exhibit A.

### Relationship Between Technology Innovations and Inventor

Technology Innovations is the assignee of the subject application of which Elizabeth D. Liddy is the sole inventor. The relationship between Technology Innovations and the sole inventor, Elizabeth D. Liddy, is further explained in the Declaration by Technology Innovations, submitted herewith as Exhibit B.

### Proof of Inventor's Refusal to Execute

As stated in the Declaration by Technology Innovations, attempts were made to reach the sole inventor, Elizabeth D. Liddy, in order to obtain the executed §1.63 declaration. Furthermore, legal representative of Technology Innovations, Townsend and Townsend and Crew LLP ("TTC"), had also attempted to reach Elizabeth D. Liddy to no avail, as evidenced by a letter correspondence sent to Elizabeth D. Liddy from one of TTC's attorneys, a copy of which is attached hereto as Exhibit C.

### Last Known Address of Inventor

The last known address of the inventor, Elizabeth D. Liddy, is 104 Victoria Place, Syracuse, NY 13210.

### Proprietary Interests

As evidenced by the Declaration of Technology Innovations, Technology Innovations has established a prima facie case that it has been assigned the subject application, the inventor Elizabeth D. Liddy has agreed to assign the subject application, or it has otherwise demonstrated a proprietary interest in the subject mater of the subject application.

|| Elizabeth D. Liddy                                                         <u>PATENT</u> |
Application No.: 10/137,740
Page 3

### Preservation of Rights

The filing of the subject application is necessary to preserve the rights of Technology Innovations and prevent irreparable damage. As stated in the Declaration by Technology Innovations, Technology Innovations' primary purpose for entering into the Purchase Agreement is to acquire rights in the subject matter covered by the subject application. If Technology Innovations is not allowed to pursue and prosecute the subject application, it is clear that the rights of Technology Innovations will be adversely affected and Technology Innovations will suffer irreparable damage in that Technology Innovations will not be able to obtain patent protection for the subject matter covered by the subject application.

### Required Fee

Please charge the fee required by this petition as set forth in §1.17(h), as well as any additional required fees, or credit any overpayment, to Deposit Account #20-1430.

### Conclusion

It is respectfully submitted that the requirements for a petition under 37 C.F.R. §1.47(b) have been satisfied and, therefore, this petition should be granted. If there are any questions concerning the foregoing, please do not hesitate to contact the undersigned at (415)576-0200.

Respectfully submitted,

Horace H. Ng
Reg. No. 39,315

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
Tel: (415) 576-0200
Fax: (415) 576-0300
HHN
SF 1457194 v1

**RECEIVED**

OCT 0 1 2003

OFFICE OF PETITIONS

Attorney Docket No.: 017704    I2US

PTO/SB/01A (10-00)
Approved for use through 10/31/2002. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

As the below named inventor(s), I/we declare that:

This declaration is directed to:

☐    The attached application, or

☒    Application No. <u>10/137,740</u>, filed on <u>April 30, 2002</u>,

         ☐ as amended on _____ (if applicable);

I/we believe that I/we am/are the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought;

I/we have reviewed and understand the contents of the above-identified application, including the claims, as amended by any amendment specifically referred to above;

I/we acknowledge the duty to disclose to the United States Patent and Trademark Office all information known to me/us to be material to patentability as defined in 37 CFR 1.56, including material information which became available between the filing date of the prior application and the National or PCT International filing date of the continuation-in-part application, if applicable; and

All statements made herein of my/our own knowledge are true, all statements made herein on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and may jeopardize the validity of the application or any patent issuing thereon.

---

**FULL NAME OF INVENTOR(S)**

Inventor one    <u>Elizabeth D. Liddy</u>       Date: _____

Address:    <u>104 Victoria Place, Syracuse, NY 13210</u>

Signature: _____      Citizen of:   USA

---

Name    <u>Michael Weiner</u>       Date:   6-25-2003

Title:    CEO, Technology Innovations, LLC
(signing on behalf of assignee Technology Innovations, LLC)

Signature: _____      Citizen of:   USA

---

☐ Additional inventors are being named on _____ additional form(s) attached hereto.

Burden Hour Statement: This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is used by the public to file (and the PTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This form is estimated to take 1 minute to complete. This time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

SF 1457191 v1

RECEIVED

OCT 0 1 2003

OFFICE OF PETITIONS

"Express Mail" Label No. _E. 3308 56355 US_
Date of Deposit _6-27-03_

PATENT

Attorney Docket No.: 017704-001012US

I hereby certify that this is being deposited with the United States Postal
Service "Express Mail Post Office to Address" service under 37 CFR 1.10
on the date indicated above and is addressed to:

Assistant Commissioner for Patents
Attn: Box DAC
Washington, D.C. 20231

By: _Julie Taylor Clough_

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

    Elizabeth D. Liddy

Application No.: 10/137,740

Filed: April 30, 2002

For: TECHNIQUES FOR
CONTROLLING DISTRIBUTION OF
INFORMATION FROM A SECURE
DOMAIN

Art Unit:    2151

DECLARATION OF TECHNOLOGY
INNOVATIONS IN SUPPORT OF
PETITION FOR FILING PATENT
APPLICATION UNDER 37 CFR § 1.47(b):
APPLICATION BY ASSIGNEE WHEN A
SOLE INVENTOR REFUSES TO SIGN
OR CANNOT BE FOUND

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

    I, Michael Weiner, declare as follows:

    1.    I am the Chief Executive Officer of the assignee of the above-referenced subject application, Technology Innovations, LLC ("Technology Innovations") located at 150 Lucius Gordon Drive, Suite 215, West Henrietta, NY 14586.

    2.    On behalf of Technology Innovations, I am submitting this declaration in support of the Petition for Filing Patent Application Under 37 U.S.C. §1.47(b) when a sole inventor refuses to sign or cannot be found.

    3.    Technology Innovations acquired from Textwise Company, LLC ("Textwise Company"), amongst other things, the entire right, title and interest in the subject application in 2002.  A copy of the Purchase Agreement executed between Technology Innovations and Textwise Company is attached hereto as Exhibit 1.

|| Elizabeth D. Liddy
Application No.: 10/137,740
Page 2

4.    A redacted copy of a proposal (Broad Agency Announcement: BAA 98-34; Proposal Title: "GUARD-IT") (the "Proposal") submitted by Textwise Company to the U.S. government for a sBIR grant is attached hereto as Exhibit 2.

5.    The Proposal and the above-referenced subject application are related to the same subject matter, namely, the "GUARD-IT" technology.  Please see generally the Proposal and Appendix A of the above-referenced subject application.

6.    As shown in Sections K and L of the Proposal, it is clear that the sole inventor, Elizabeth D. Liddy, of the subject application was an employee of Textwise Company and that the "GUARD-IT" technology as described in the Proposal was deemed to be owned by Textwise Company.

7.    Elizabeth D. Liddy, the sole inventor of the subject application, has transferred in writing, amongst other things, her entire right, title and interest in the subject application to Textwise Company, as evidenced by Section 6(c) of the Amended Employment Agreement executed between Textwise Company and Elizabeth D. Liddy.  A copy of the Amended Employment Agreement is attached hereto as Exhibit 3.

8.    Upon information and belief, attempts were made to reach Elizabeth D. Liddy in order to have her execute the proper declaration for the subject application.  Such attempts were futile and, to date, the proper declaration for the subject application remains unexecuted.

9.    The last known address of Elizabeth D. Liddy is 104 Victoria Place, Syracuse, NY 13210.

10.    The Purchase Agreement executed between Technology Innovations and Textwise Company was entered into for the primary purpose of acquiring rights to the subject matter covered in the subject application.  If Technology Innovations is not allowed to pursue and prosecute the subject application, the rights of Technology Innovations will be adversely affected and Technology Innovations will suffer irreparable damage in that Technology Innovations will not be able to obtain patent protection for the subject matter covered in the subjection application.

Elizabeth D. Liddy
Application No.: 10/137,740
Page 3

11.    A §1.63 declaration executed by me on behalf of Technology Innovations is submitted herewith under 37 U.S.C. §1.47(b) as part of the Reply to the Notice to File Missing Parts issued in connection with the subject application.

12.    Technology Innovations has been advised that the subject application has been abandoned.  Such abandonment is inadvertent and unintentional.  The entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 C.F.R. §1.137(b) was unintentional.

The undersigned declares further that all statements made herein of his own knowledge are true and that all statements made on information and belief are believed to be true and further that these statement made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the subject application or any patent issuing thereon.

Respectfully submitted,

_____
Michael Weiner
Date: 6-25-2003

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
Tel: (415) 576-0200
Fax: (415) 576-0300
HHN
SF 1457192 v1

# PURCHASE AGREEMENT

This Purchase Agreement ("Agreement") is made as of this 1st day of May 2002, by and between Technology Innovations, LLC, a New York limited liability company ("Buyer") and Textwise Company, L.L.C., a New York limited liability company ("Seller").

WHEREAS, Seller has developed and owns and possesses certain properties and rights in technology relating to the identification and control of electronic communications, which are more fully described in a pending U.S. Patent application by Elizabeth D. Liddy, Inventor, Textwise Company, L.L.C., assignee, initially filed as a Provisional Application on October 27, 1999 and assigned Application No. 60/161,792 and then filed as a Non-Provisional Application on October 26, 2000 and assigned Application No. 09/699,288, with a Non-Provisional Continuation filed on August 28, 2001 and assigned Application No. 09/942,027 and any associated continuing applications or foreign patent(s) and application(s) therefor ("Pending Patent(s)"); and

WHEREAS, Buyer desires to purchase, and Seller desires to sell and transfer, said properties and rights to the Pending Patent(s) upon the terms and subject to the conditions set forth herein; and

WHEREAS, Buyer desires to continue to prosecute the Pending Patent(s), and to exclusively enjoy any rights derived from said Pending Patent(s).

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Purchase and Sale.

   1.1  Seller hereby sells, assigns and conveys to Buyer, and Buyer hereby accepts from Seller, all of Seller's right, title and interest in the following assets: (a) all worldwide right, title, and interest in and to the Pending Patent(s) as presently developed; and (b) all patent and patent applications that issue as a result of said Pending Patent(s).

   1.2  Seller agrees to promptly (within ten (10) days of the date hereof) inform Seller's attorney responsible to date for prosecuting the Pending Patent(s) of this Agreement and transfer consummated hereby.  Seller further agrees to allow Seller's Patent Attorney to continue prosecution of the patent should Buyer agree with the continued representation, and to execute a waiver with respect to any conflict of interest that such representation might present.

   1.3  Except as set forth herein, Buyer is not assuming any liabilities or obligations of Seller, and Seller agrees to satisfy them in the ordinary course of business.  Seller shall be responsible for all of the fees and costs accrued and paid by Seller prior to the date of this Agreement with respect to the Pending Patent(s)  and shall indemnify Buyer against any loss resulting from a claim by Seller's Patent Attorney for fees or costs billed to Seller prior to the date of this Agreement.

2. **Consideration**. The consideration exchanged ("Consideration") for the Pending Patent(s) shall be in the form of:

2.1 Buyer's advancement of and promise to pay to Seller's Patent Attorney all unbilled fees and costs as estimated in a 4/17/02 e-mail from Seller's Patent Attorney (approximately $500-800); and

2.2 Buyer's covenant and agreement to take all subsequent action necessary for the prosecution of the United States patent issuable in respect of the Pending Patent(s), to use all commercially reasonable efforts to license or otherwise sell or transfer any patent issued in respect of the Pending Patent(s); and

2.3 Buyer's covenant and agreement to pay Seller a commission equal to fifty percent (50%) of the net revenues (gross revenues less all costs of acquiring, maintaining and enforcing the Pending Patent(s)) derived from licenses to any patent issued in the U.S. or any other country in respect of the Pending Patent(s) which licenses are granted by Buyer, or from Buyer's sale or other disposition of any patent issued in the U.S. or any other country in respect of the Pending Patent(s) or any interest therein.

3. **Confidentiality**. Seller shall not, directly or indirectly, use or disclose, or cause or allow to be used or disclosed, to Buyer's detriment, any secret, confidential, or proprietary information relating to the Pending Patent(s); provided, however, that Seller's duty to keep certain information confidential shall only apply to the extent said information, is not publicly known.

4. **Inventor Records and Access**. Seller shall permit Buyer, and its attorneys, agents and designees, access to and right to copy, documents of Seller or in its possession that are not a part of the Pending Patent(s) but are directly related to the Pending Patent(s), particularly including inventor records, invention assignments and/or employment contacts and agreements. Seller further represents and warrants that it has records and documents suitable to establish its ownership interest in the Pending Patent(s), including the employment agreement executed by Inventor with Textwise Company L.L.C. to transfer patent rights to Textwise Company L.L.C., a copy of which has been provided to Buyer.

5. **Infringement**. All rights to pursue legal actions against any third party for infringement of the Pending Patent(s) shall be Buyer's, and any action to enforce the Pending Patent(s) rights shall be at Buyer's sole discretion. In the event of enforcement action undertaken by Buyer, Buyer shall deduct from any damage award or settlement funds all costs of enforcement (including attorneys' fees) prior to any split pursuant to Section 2.3 above.

6. **Seller's Representations and Warranties**.

6.1 **Authorization; Enforceability**. The execution, delivery and performance of this Agreement, and all of the documents and instruments required hereby, by Seller are within Seller's power and have been duly authorized by all necessary action. This Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by Seller,

the valid and binding obligations of Seller, enforceable in accordance with their respective terms.

6.2  No Violation or Conflict.  The execution, delivery, and performance of this Agreement by Seller do not and will not conflict with or violate any law, judgment, order, decree, the articles of organization or operating agreement of Seller, or any contract or agreement to which Seller is a party or by which Seller is bound, except to the extent there exist contracts or agreements with Syracuse University or any of its affiliates relating to the Pending Patent(s).

6.3  Title.  Seller is hereby transferring to Buyer all of Seller's right, title and interest in and to the Pending Patent(s), free and clear of any and all mortgages, liens, encumbrances, charges, claims, restrictions, pledges, security interests, or impositions of any kind, and no rights, properties, or information that relate to the Pending Patent(s) have been transferred by Seller to any other person or entity; provided that nothing in this representation or this Agreement is intended to be or shall be construed as a representation or warranty (i) that a patent will be ultimately granted in the United States or any foreign jurisdiction with respect to the Pending Patent(s), (ii) as to the financial viability of any business based in whole or in part on the Pending Patent(s), or (iii) that the Pending Patent(s) does not infringe on the rights of others.

6.4  Disclosure.  Seller has furnished to Buyer complete and accurate copies or originals of all documents and/or information requested by Buyer in connection with this Agreement. No disclosure or statement of fact by Seller contained in this Agreement contains any untrue statement of a material fact.

7.  Buyer's Representations and Warranties.

7.1  Authorization;  Enforceability.  The execution, delivery, and performance of this Agreement, and all of the documents and instruments required hereby, are within the power of Buyer and have been duly authorized by all necessary action. This Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable in accordance with their respective terms.

7.2  No Violation or Conflict.  The execution, delivery, and performance of this Agreement by Buyer do not and will not conflict with or violate any law, judgment, order, decree, the articles of incorporation or bylaws of Buyer, or any contract or agreement to which Buyer is a party or by which Buyer is bound.

7.3  Due Diligence.  Buyer has relied upon its own due diligence with respect to the Pending Patent(s) and has not relied upon any statement or representation of the Seller except as to the title matters expressly represented by Seller herein.

8.  Mutual Indemnification.  Each party agrees to indemnify and hold the other harmless, defend against and reimburse the other for any and all losses, damages, costs, expenses, liabilities, obligations, and claims of any kind by third parties (including reasonable attorneys' fees) which the other may incur, or become subject to, as a result

of: (i) any breach of this Agreement or inaccuracy of any of the representations and warranties made by the party in or pursuant to this Agreement; and (ii) any failure by the party to carry out, perform, satisfy, and discharge any of their covenants, agreements, undertakings, liabilities, or obligations under this Agreement or under any of the documents and materials delivered by the party pursuant to this Agreement. In no event shall Seller's liability hereunder exceed the Consideration.

9.  **Buyer's Right/Obligation to Rescind Transfer.**  In the event Buyer chooses, at its sole discretion, not to pursue protection and/or licensing under the Pending Patent(s), Buyer shall have the option to rescind the transfer of the Pending Patent(s) hereunder, upon ninety (90) days notice, and to re-assign the Pending Patent(s) or any patents issued in respect thereof to Seller (at Buyer's expense).  In the event Buyer shall determine that it does not wish to pay the ongoing maintenance fees of any patent issued in respect of the Pending Patent(s) then Buyer shall provide Seller with notice at least ninety (90) days prior to the due date of such fees whereupon Buyer shall at Seller's option, re-assign the Pending Patent(s) and all patents issued in respect thereof to Seller (at Buyer's expense).  Upon any such reassignment to Seller, Buyer shall relinquish its rights in any current or future licensing revenues related to the Pending Patent(s).

10.  **Additional Assurances.**  From time to time, upon the request and at the expense of Buyer, Seller shall execute and deliver, and cause to be executed and delivered, such further instruments of conveyance, assignment, and transfer and take such further action as Buyer may reasonably request in order more effectively to sell, assign, convey, transfer, reduce to possession, and/or record title to Buyer of any of the Pending Patent(s). Seller shall cooperate with Buyer in all reasonable respects to assure to Buyer the continued title to and possession of the Pending Patent(s) in the condition and manner contemplated by this Agreement. Furthermore, Seller shall cooperate with and generally assist Buyer, including the rendering of testimony in any deposition or other proceeding, in the enforcement and defense of the Pending Patent(s) and any related legal proceedings in connection therewith.

11.  **Miscellaneous Provisions.**

11.1    **Amendments.**  No amendment, modification, or alteration of this Agreement shall be valid or binding unless in writing and signed by the parties hereto.

11.2    **Governing Law.**  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, excluding its conflict of laws provisions.

11.3    **Entire Agreement.**  This Agreement and the related Patent(s) Assignment attached hereto as an Exhibit represent the entire agreement between the parties with respect to the subject matter hereof. This Agreement supersedes all previous negotiations, discussions and commitments with respect to the subject matter hereof.

11.4    **Waiver.**  The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed as a waiver of any such provision, nor in any way affect the validity of this Agreement or any part

Text-leafPurchAgr (clean) 053112002.doc

hereof.

    11.5  Successors and Assigns. This Agreement shall be binding upon the Buyer and Seller, and their respective successors, assigns, heirs, and legal representatives.


    IN WITNESS WHEREOF, the parties have executed this Purchase Agreement as of the date first above written.

Seller

By: _____

Name/Title: David Snyder President, plan Ventures

Date: 6 / 10 / 2002

Buyer

By: _____

Name/Title: Michael L. Weiner / CEO

Date: 5 / 29 / 2002

## Exhibit – Assignment of Patent(s)

WHEREAS, Textwise Company, L.L.C., a New York limited liability company having offices at 1100 Chase Square, Rochester, New York 14604 ("Seller"), owns, by assignment, right, title, and interest in U.S. Patent Application Nos. 09/699,288 and 09/942,027, entitled Techniques For Controlling Distribution Of Information From A Secure Domain, and any invention claimed therein or in related foreign patents or applications ("Pending Patent(s)"); and

WHEREAS, Technology Innovations, LLC, a New York limited liability company having offices at 150 Lucius Gordon Drive – Suite 201, West Henrietta, New York ("Buyer") desires to own Seller's entire right, title, and interest in and to the invention and Pending Patent(s).

NOW THEREFORE, be it known that, for good and valuable consideration, receipt of which is hereby acknowledged, Seller hereby sells, assigns, transfers, and sets over to Buyer, its lawful successors and assigns, Seller's entire right, title, and interest in and to U.S. Patent Application Nos. 09/699,288 and 09/942,027, the invention claimed therein, any other patent application directed to the invention, and all Letters Patent of the United States that may be granted thereon, and all reissues, reexaminations, and extensions thereof; and all rights to claim priority on the basis of such application, and all applications for Letters Patent that may be filed for the invention in any foreign country and all Letters Patent that may be granted on the invention in any foreign country, and all extensions, renewals, and reissues thereof; and Seller hereby authorizes and requests the Commissioner of Patents and Trademarks of the United States and any official of any foreign country whose duty it is to issue patents on applications as described above, to issue all Letters Patent for this invention to Buyer, its successors and assigns, in accordance with the terms of this Assignment;

AND, Seller HEREBY further covenants that Seller has the full right to convey the interest assigned by this Assignment, Seller will take all action and execute all documents necessary to perfect the interest assigned hereby, and Seller has not executed and will not execute any agreement in conflict with this Assignment;

IN TESTIMONY WHEREOF, each party has caused its authorized representative to execute this Assignment.

Textwise Company, LLC

By _____

Date 6/10/2002

Technology Innovations, LLC

By _____

Date 5/25/02

STATE OF NEW YORK
COUNTY OF MONROE : ss.:

On this 10th day of June, 2002, before me, a Notary Public in and for the State and County aforesaid, personally appeared Lisa Snyder, to me known to be the person of that name, and a representative of Manning & Napier Information Services, LLC who signed and sealed the foregoing instrument and who acknowledges the same to be her/his free act and deed.

_____
Notary Public

TextualPartAgr (clean) 05/03/2002.doc

BRENDA F. OATHOUT
Notary Public, State of New York
Qualified in Livingston County
Commission expires June 30, ...

Textwise Company

# VOLUME I - COVER PAGE

Broad Agency Announcement: BAA 98-34

Proposal Title: "GUARD – IT"

Technical Topic Area: "Advanced Boundary Controllers"

Points of Contact:

| TECHNICAL | ADMINISTRATIVE |
|---|---|
| Dr. Elizabeth D. Liddy | Paul C. Wilson |
| TextWise LLC | TextWise LLC |
| 2-212 Center for Science & Technology | 2-212 Center for Science & Technology |
| Syracuse, NY 13244 | Syracuse, NY 13244 |
| email: liz@textwise.com | email: paul@textwise.com |
| Tel: 315.443.1989 / Fax 315.443.4053 | Tel: 315.443.1989 / Fax 315.443.4053 |

Program Duration: 24 months

Total Program Cost Plus Award Fee: ▇▇▇▇▇

Funding Requirements by Calendar Year:  CY1 - ▇▇▇▇▇  /  CY2 - ▇▇▇▇▇

*"This data shall not be disclosed outside the government and shall not be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the proposal; provided, that if a contract is awarded to this offerer as a result of or in connection with the submission of this data, the government shall have the right to duplicate, use or disclose the data to the extent provided for in the contract. This restriction does not limit the government's right to use the information contained in the data if it is obtained from another source without restriction.*

*The information contained in this proposal is privileged and confidential commercial and financial information. TextWise, LLC restricts this data from public disclosure, and any such disclosure would cause substantial harm to the competitive position of TextWise, LLC. As such, all of the data contained in the entirety of the proposal is excepted from release into the public domain by exception (4) of the Freedom of Information Act as amended in 1974 by Public Law 93-502."*

## B. EXECUTIVE SUMMARY

GUARD-IT is an advanced, natural language processing, boundary controller.  GUARD-IT will determine whether outgoing messages are potentially in violation of a classification guide by extracting topics from the guide, constructing semantic models of these topics, and then comparing the meaning content of messages against these models.  GUARD-IT will be a significant advance over the state of the art, because current automated guards merely compare messages with a "dirty word" list.  GUARD-IT, on the other hand, will synthesize rich, conceptual-level representations of the meanings of classified topics and outgoing messages. The semantic model of each message is then compared with all of the topic semantic models.  If there is a match and if the classification level of the matching topic model exceeds that of the sender or the recipient, then the message is barred from release.

Semantic models of classified topics are essentially meaning-based releasability templates and are constructed in two stages.  The first stage is to extract the topic statements from a classification guide and expand them using a comprehensive lexical database.  The expanded topic representations are then submitted as queries to DR-LINK, a natural language processing information retrieval system developed by TextWise LLC.  A set of text segments relevant to these queries will then be retrieved from a collection of military manuals and statements of military doctrine.  By providing examples of the topic, by indicating synonymous phrasings of the topic, etc., these text segments are the basis for generating an enriched representation of the corresponding topic.

The second stage in constructing the topic semantic model is to extract rich knowledge representations from the retrieved set of text segments.  The base technology for this extraction is the KNOW-IT system, which is being developed by TextWise LLC within DARPA's High Performance Knowledge Base (HPKB) program.  KNOW-IT can successfully convert news type texts into a formal knowledge representation.  For the GUARD-IT project, this core functionality will be tailored to the extraction of information from classification guides, military doctrine, and email messages.  The knowledge representations assigned to the text segments retrieved by DR-LINK will then constitute a semantic, releasability model of the corresponding topic.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

## C. PROPOSAL ROADMAP

<u>Principal Goal</u>: Application of Natural Language Processing (NLP) techniques to the boundary control task, resulting in a new generation of "intelligent", content-based boundary controllers. (Pg 20 -30)

<u>Tangible End User Benefits</u>: Substantial reduction in the human resources required to provide adequate, content-based information security.  (Pg 31-34)

<u>Critical Technical Barriers</u>: These are the general problems associated with the intelligent, automated processing of natural language text. (Pg 20-30)

<u>Key Elements of the Proposed Approach</u>: A semantic representation is built in real time for each message and this model is then compared with semantic releasability models constructed from relevant security guides.  (Pg 20-34)

<u>Critical Success Factors</u>: The critical factor in development of "intelligent" boundary controllers is the extension of our prior successes in NLP-based technology.  In particular, what is required is a modification of the technology to handle the text types (email messages and classification guides) relevant to the boundary control problem.  (Pg 20-30)

<u>Expected Results</u>: Development and delivery of an NLP-based intelligent boundary controller, suitable for inclusion in a variety of demonstration environments. (Pg 31-34)

<u>Risk of Not Performing Work</u>: High-assurance, content-sensitive boundary control will continue to require manual intervention. (Pg 20-34)

<u>Evaluation Metrics</u>: Principal development metrics will be suitably modified versions of the "precision" and "recall" information retrieval metrics.  (Pg  28)

<u>Program Cost by Program Year</u>: CY1 = $ 952,278  /  CY2 = $ 756,044

**Use or Disclosure of proposal data is subject to the restrictions on the cover page**

**D. COST & FEE SUMMARY**     [ REDACTED]

## E. SUMMARY OF INNOVATIVE CLAIMS

GUARD-IT is a semantic boundary controller based on natural language processing and knowledge base technologies. The GUARD-IT system is an integrated, yet modular, boundary controller, which can function as:

(1) An automatic knowledge extraction system which converts outgoing messages into formal knowledge representations

(2) An automatic knowledge base construction system which converts security classification guides into formal knowledge representations

(3) A complete domain boundary controller for text messages

While these tools will be usable separately, GUARD-IT will be seamless in the information assurance environment. The system will categorize outgoing messages on the basis of whether or not their conceptual-level representations are significantly similar to the representations extracted from the topics of security classification guides. A security officer will be required to review messages only when the system cannot make a definite determination about whether a message violates security policy. The results of this manual review will be used as training data by the embedded Supervised Learner, which will gradually improve the effectiveness and automaticity of the system over time.

While the features listed above are innovative in their own right, the combination of them into a stand-alone system represents an important advance over the current state of the art.

(1) Intelligent text extraction from new text types. Email messages represent a challenging use of language for traditional text extraction systems. The GUARD-IT system will adapt the KNOW-IT knowledge extraction system, which has already been successfully applied to newswire text, to process less structured and more casual email messages.

(2) Automated expansion of security classification topics into a topic semantic model using relevant text segments retrieved from military manuals and doctrines. The capability is new, since it involves a unique combination of natural language processing and information retrieval techniques to convert succinct security classification topics into rich knowledge representations.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

(3) Scalability. The types of security classification guides which can be handled by the GUARD-IT system are only limited by the availability of a relevant document collection. The reason for this is that a relevant document collection is needed to build semantic models for the topics in the given security classification guide. Accordingly, the application of GUARD-IT to DOD guides is unproblematic, since relevant military manuals and doctrine can be obtained (at least within a particular classification domain). Since the GUARD-IT system can potentially handle any type of text, it is a domain-independent system.

(4) Gradual improvement of system automaticity and effectiveness. The GUARD-IT system includes a machine learning module, which will be based on a supervised learning algorithm. The use of this module will improve the recall and precision of the system over time. The input for this module will consist of messages that could not be handled by the system but were later categorized by the security officer. The rules output by the machine learning module will be used to enhance the performance of the overall system and to decrease its reliance on manual intervention.

(5) Control over the trade-off between system effectiveness and efficiency. The GUARD-IT system allows security officers or their superiors to determine whether the performance of the system will favor effectiveness over efficiency or vice versa. The system can be configured to generate the minimum number of messages to be reviewed by the security officer (to improve overall use of system and human resources). In this case, the system would operate fully automatically, but it would have very low precision (at least until the machine learning module had had a chance to remedy matters).

(6) Meaning-based domain boundary control. The GUARD-IT system will understand the semantic content of security classification guides and outgoing messages and will compare guides with messages at the level of conceptual content. This is possible, because full natural language processing techniques will enable the system to understand and represent message and policy contents. This will result in a great improvement over the current approach of filtering outgoing messages on the basis of a simple keyword match.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

## F. STATEMENT OF WORK

### F.1 Objective

The objective of this effort is to develop and deliver a state of the art domain boundary controller called GUARD-IT, which utilizes natural language understanding as its basis for decision making. This is being planned as a two-year effort running from January 1, 1999 through December 31, 2000.

### F.2 Scope

This Statement of Work (SOW) defines the tasks and corresponding effort required to design, develop, test, evaluate, and deliver the proposed GUARD-IT system to the contracting agency. It includes the definition of the technical tasks as well as the associated program management and logistics necessary to complete the task.

### F.3 Background

Details regarding TextWise's accomplishments in the area of information retrieval and extraction are provided in subsection K.1 of this proposal. Information on the qualifications of key personnel is provided in subsection K.2.

### F.4 Task/Technical Requirements

This description of tasks is shown in more detail in the Section I. Technical Plan section as well, in order to indicate task overlaps and dependencies. Milestones for each task are the successful development of the specific product as defined in the system architecture design stage.

**Task 1: Design Detailed System Architecture.** In this task, we will design a detailed system architecture to capture system requirements from each of the sub-modules of the system. We will also begin the design of APIs between sub-modules. All members (TextWise, Naval Postgraduate School consultant, and Trusted Information Systems, a partner system integrator) will participate in the task. The product of this task will be a detailed list of system requirements for the entire project, as well as a set of early designs for APIs, which will link the modules.

**Task 2: Develop Batch Processing Subsystem.** The goal of developing this subsystem to construct a semantic model knowledge base of the security classification topics automatically. An information retrieval system will generate a collection of textual information about a security

classification topic from military manuals or doctrines. Then, a knowledge extraction system will convert the textual information about a topic into the semantic model, which will be used as the basis for determining the classification level of the outgoing messages.

**2.1 Adapt Document Retrieval using LINguistic Knowledge (DR-LINK) Indexer to process military manuals or doctrines.** The DR-LINK system is a natural language processing based information retrieval system, which is developed at TextWise, LLC. The DR-LINK Indexer converts raw documents into a searchable database by recognizing and representing the concepts in the documents as a part of the DR-LINK database.

**2.2 Develop Topic Parsing Semantic Tagger.** The Topic Parsing Semantic Tagger will decompose the security classification guides into meaningful units while preserving the relationships amongst the classification topic and classification levels (e.g. Secret, Confidential, etc.) The tagger will utilize various syntactic and semantic analysis systems to parse the classification guide. The tagger will also assign the semantically appropriate WordNet synset to each concept, which constitute the classification topics. The WordNet is an ontology, which organizes concepts via various semantic relations such as synonym or hyponym. The WordNet synset assignment process is equivalent to the word sense disambiguation process of selecting the most appropriate sense for each word. The WordNet synset assignment is also equivalent to the conversion of the terms in the topic into concepts. The assigned synsets will be used in the DR-LINK Matcher to improve the information retrieval effectiveness especially with respect to accuracy. The conceptual representation of the topics will be used as the queries for the DR-LINK Matcher.

**2.3 Adapt DR-LINK Matcher to use security topic as the queries.** The DR-LINK system is designed to take natural language texts as input. These texts might be represented as information seeking question forms. The system then uses these texts as queries converting them into logical requirements to retrieve possibly relevant documents from the database. The adaptation will be to include the use of WordNet synset information, which is assigned to each term in the security classification topics. The concepts from the queries generated by the Topic Parsing Semantic Tagger will be correctly expanded with respect to the context by adding the synonyms or

**Use or Disclosure of proposal data is subject to the restrictions on the cover page**

hyponyms. The expanded queries will be used by the DR-LINK matcher to retrieve relevant text segments from the military manuals or doctrines based on the security classification topics.

**2.4 Develop Knowledge Extractor to build Topic Semantic Model Knowledge Base.** The retrieved text segments from the DR-LINK Matcher will be fed into the Knowledge Extractor. The Knowledge Extractor converts naturally occurring texts into the semantic representation. This is done through use of the knowledge extraction algorithm, which was developed as a part of the KNOW-IT system. The KNOW-IT system was developed to extract knowledge from texts to build knowledge bases automatically. The goal of this task will be the adaptation of the KNOW-IT Knowledge Extractor to process military documents or doctrines for the purpose of automatically augmenting the original security classification topic semantic model. This work will be an extension of the previously developed knowledge extraction system. This is because the goal of this task is also to build an unified model of a topic instead of building a heterogeneous collection of extracted facts or axioms, which was the goal of the KNOW-IT system.

**2.5 Integrate Batch Processing Subsystem.** This task will involve the integration of the various subsystems, which includes the full DR-LINK system and the KNOW-IT Knowledge Extractor component.

**Task 3: Develop Real-time Processing Subsystem.** The goal of developing this subsystem is to compare the outgoing messages against the semantic model of the security classification topic to determine the classification level of the messages. If the classification is higher than the accepted level for either the sender or receiver, the system will take appropriate action. The subsystem will include an interface to the administrator of the system, namely a security officer, who will determine the security classification category of the messages, which are considered to be uncertain with respect to their security policy violation by the GUARD-IT system. The manually categorized messages will be used as the training data for the Supervised Machine Learning module, which will be used to modify the Topic Semantic Model Knowledge Base to improve the accuracy of the classification.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

**3.1 Develop Meta Information Interpreter.** The Meta Information Interpreter will parse the outgoing messages into a number of functional elements of the message. For example, sender and receiver identification, message date, and message routing history will be recognized and represented separately by using SGML like tags. The development of this system will be based on the analysis of the typical structure of the documents. An example of this is in an electronic mail message where the sender of the message is usually preceded by the word, 'From:'.

**3.2 Develop Outgoing Message Database.** The outgoing messages, which are parsed by the Meta Information Interpreter, will be stored in a COTS relational database system. The recognized meta information will be placed in corresponding fields within the database. The text portion of the Outgoing Messages will be also indexed using an Oracle native mechanism to allow full text searching capability. In the proposed system, Oracle8 will be used to build the Outgoing Message Database and will allow any qualified users such as the security officer to retrieve any messages via adhoc queries. A simple user interface will be also developed to allow easy access.

**3.3 Develop Knowledge Extractor to Process Outgoing Messages.** Within the Batch Processing Subsystem, a Knowledge Extractor will be adapted to process military manuals or doctrines and convert the texts into a knowledge representation based on the concept-relation triples. In this task, the KNOW-IT Knowledge Extractor will be adapted to process messages, which are likely to be less structured than the military manuals or doctrines. The Knowledge Extractor will convert the semantic content of each message into the concept-relation triple style knowledge representation. This will be done by extracting implicit semantic relations, which occur among concepts in the messages. The outgoing message will be passed to the KNOW-IT matcher.

**3.4 Integrate KNOW-IT Matcher.** The KNOW-IT Matcher will be used to compare the outgoing messages against the security classification topic semantic model to determine the classification level of the message. The original KNOW-IT matcher is designed to function as a component of a question-answering system. The integration of the KNOW-IT Matcher will preserve the highly accurate question-answering effectiveness of the original system in

Use or Disclosure of proposal data is subject to the restrictions on the cover page

categorizing the outgoing messages. It might be easy to understand the matching process if the outgoing messages are considered as the questions and the semantic model for each security classification topic as the answers to be found. If the KNOW-IT Matcher finds a highly correlated topic against an outgoing message, then the message will be categorized according to the classification scheme, which is attached to the topic. If the Matcher does not find any related topic or topic with an unclassified categorization, then the message will be considered to be unclassified. If the Matcher finds one or more somewhat related topics with a classified categorization against an outgoing message, then the message will be passed to the Message Inspector.

**3.5 Develop Message Inspector.** The Message Inspector receives messages for which the KNOW-IT matcher could not accurately determine the classification level. The Message Inspector will be used by the security officer to manually inspect these messages. There will be a graphical user interface, which shows the message in question, and the reason why this message has been selected as possibly containing classified information. The Inspector will show the security officer the region(s) of the messages, which might contain the classified information, and the corresponding topic model, which showed some similarity to the selected region(s). In addition, the Inspector will be able to show any meta information about the messages. The security officer will be able to easily mark which messages do contain classified information and which do not. The messages with classified information will be passed to the Rejected Message Database for further processing if it is desired by the security policy. A copy of a message which does not contain classified information will be passed to the Supervised Learner and the original message will be passed to the outgoing message server such as a POP mail server for the delivery to the intended recipient.

**3.6 Integrate Real-time Processing Subsystem without Supervised Learner.** After all the modules except for the Supervised Learner in the Real-time Processing Subsystem are implemented, the modules will be integrated into one system. This system will be used within the Information Assurance Year 1 Comparative Evaluation.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

**3.7 Develop Supervised Learner.** The Supervised Learner will learn from the manually categorized outgoing messages which were produced as a result of the GUARD-IT system being unable to automatically determine the classification level of the message. In recent machine learning related research, it has been shown that the learning from the data that could not be automatically categorized is just as effective as the learning from both categorized and non-categorized data. This provides for a more efficient method of machine learning due to the fact that the learning data set does not need to be as large. The development of the Supervised Learner will be based on the use of machine learning techniques such as the decision tree method.

**3.7.1 Prepare Training & Test Data.** The training and test data will be drawn from selected Usenet News traffic. For example, all message traffic of a Usenet News group, such as the one that discusses Unix Operating Systems, such as Sun Solaris, will be captured. Then, a simulated security classification guide will be constructed by treating Solaris as a potentially classified computer software. The types of information about a software, which tend to be classified will be learned from declassified classification guides and applied in constructing a simulated security guide. A set of documents, such as manuals of the Solaris operating system and any documents about the software, will be collected and indexed to create the DR-LINK Database to be used to generate a Topic Semantic Model Knowledge Base. A set of messages, which have been not selected as the training data will be set aside as the test data. The pseudo-classification level of the test data will be manually determined.

**3.7.2 Develop Learning Model.** A randomly selected set of Usenet News traffic about the Solaris operating system will be treated as the outgoing messages. The Supervised Learning process will be simulated by an analyst of the project, who is familiar with the simulated security guide, acting as the security officer. The GUARD-IT system will be trained until the percentage of messages that are passed to the Message Inspector is dropped to a pre-determined threshold.

**3.7.3 Test the Learning Model.** A set of Solaris Usenet News messages, which has been used during the training stage, will be fed into the GUARD-IT system. The accuracy of the classification will then be measured by evaluating the messages in both the unclassified and

Use or Disclosure of proposal data is subject to the restrictions on the cover page

classified categories. The accuracy will be measured against previously judged results. The percentage of messages that have been passed to the Message Inspector will be measured to calculate the coverage of the GUARD-IT system.

**3.8 Integrate Real-time Processing Subsystem.** After all the components of the Real-time Processing Subsystem, including the Supervised Learner, have been implemented, the modules will be integrated into one system. This system will be used within the Information Assurance Year 2 Comparative Evaluation.

**Task 4: Integrate Overall System without Supervised Learner.** Both the Batch Processing Subsystem and the Real-time Processing Subsystem will be integrated as a fully functioning guard system without the machine learning component. This will be done before the end of the Year 1 to be tested during the Year 1 Comparative Evaluation against a pre-determined baseline COTS guard system.

**Task 5: Integrate Overall System with Supervised Learner.** Both the Batch Processing Subsystem and the Real-time Processing Subsystem will be integrated as a fully functioning guard system along with the machine learning component. This will be done before the end of the Year 2 to be tested during the Year 2 Comparative Evaluation against a pre-determined baseline COTS guard system.

**Task 6: Develop Test Environment - Year 1.** All the tests of the GUARD-IT system will be conducted within an environment consisting of an independent networked domain with a firewall server, mail server, GUARD-IT server, test clients, and connection to the internet. This test environment will be used to develop and demonstrate the system and will be transferred to the contracting agency at the end of the contract to facilitate further evaluation. It is assumed at the start of this task that all the necessary hardware has been procured and installed in the facility to be used by TextWise personnel. As mentioned in the Technical Approach section, we will be using a COTS product called Minesweeper from Integralis as a benchmark of what current technology offers. Part of our evaluation will be to compare the effectiveness of the MIMESweeper system against the effectiveness of the GUARD-IT system. The installation of

MIMESweeper will be covered under Task 6.3 (Install Baseline System). The other subtasks that will be performed under Task 6 are: the development of a Test and Evaluation Plan (6.1), the installation of the GUARD-IT system (6.2), and actually conducting the Year 1 Comparative Evaluation (6.4).

**6.1 Develop Test and Evaluation Plan.** Under this task, TextWise will be responsible for developing a Test and Evaluation plan that details what tests are to be performed and how the results of those tests will be evaluated. The test portion will cover what test scripts will be run and give specifics about what functional area each of those scripts cover. The evaluation portion of the plan will detail the metrics that will be used to measure the effectiveness of the system. Actual percentage values that would indicate success may not be available in the plan, because the benchmark values need to be obtained from the MINESweeper system which will be evaluated as part of Task 6.3 and Task 6.4.

**6.2 Install GUARD-IT System.** The installation of the GUARD-IT system in this context will consist of taking a baselined test version of the GUARD-IT system from the software developers, installing that version in a separate area from the development version, and populating the required databases with the necessary data required to perform the test and evaluation task. The installation of the system will actually encompass the first portion of the GUARD-IT system testing by validating the installation procedures. Any anomalies noted in the installation or any other portion of the testing phase will be entered and tracked in an established Configuration Management system. As part of the installation, the system will be minimally exercised to verify the proper operation of the system.

**6.3 Install Baseline System.** As mentioned previously, TextWise will be procuring the MIMESweeper system to use as a benchmark against which the results of the GUARD-IT system will be measured. This task covers the installation of the MIMESweeper system into the test environment. We will not be evaluating the actual installation of the MIMESweeper system as this is a COTS product. As part of this installation, we will be populating MIMESweeper with the same test data that will be used to evaluate GUARD-IT. As with Task 6.2, we will also minimally exercise the system to verify the proper operation of the system.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

**6.4 Conduct Year 1 Comparative Evaluation.** As part of this task, there are four distinct things that need to be accomplished. First, we will fully test the functionality of the GUARD-IT system using the test scripts that will be developed as part of Task 6.1. Secondly, we will run the test data through the GUARD-IT system and record the results of the tests. The third task will be to run the test data through the MIMESweeper system and record the results of those tests. Finally, we will compare the results of the MIMESweeper and GUARD-IT systems against manually verified data to see how each of the systems performed. The results of this evaluation will be documented and delivered to the contracting agency as an auxiliary product of the contract.

**Task 7: Develop Test Environment - Year 2.** The purpose of Task 7 is to evaluate the improvement in performance of the system as a result of the incorporation of the Supervised Learner. The Supervised Learner will be integrated into the system as part of Task 3 and Task 5. The tasks to be performed will essentially be the same as Task 6 with each subtask being enhanced to incorporate the evaluation of the Supervised Learner.

**7.1 Revise Test and Evaluation Plan.** In Task 7.1, the Test and Evaluation plan will be updated to reflect the additional capabilities of the Supervised Learner. The plan will also be updated to add concrete figures from the results of the Year 1 Evaluation. The test scripts will also be updated to exercise the new capabilities of the system. These capabilities will include the Supervised Learner and any other enhancements added to the system as a result of the first evaluation.

**7.2: Re-Install GUARD-IT System.** This task will done in the same manner as Task 6.2. The installation will again be verified and any anomalies will be reported.

**7.3: Conduct Year 2 Comparative Evaluation.** In this task, we will run the updated test scripts against the GUARD-IT system and record any problems that are found. The test data will then be run through the system and the results will be recorded. We will then compare the results of this evaluation with the results from both the GUARD-IT system from the Year 1 evaluation and the MIMESweeper system. We will also compare the results against manually verified data to

**Use or Disclosure of proposal data is subject to the restrictions on the cover page**

see how well the improved GUARD-IT system performed overall. Results of this evaluation will be documented and delivered to the contracting agency as an auxiliary product of the contract.

**Task 8: Prepare Deployable Demonstration System.** As mentioned previously, the entire test environment will be transferred to the contracting agency at the end of the contract to facilitate further evaluation. To prepare the system for transfer, TextWise will:

(1) Update the network configuration of the system to the extent possible so that the system will operate in the contracting agency's network environment. These types of configuration changes can include IP addresses, netmasks, host tables, etc.

(2) Create full backups of the system including any relevant test data so that the system can be fully installed from scratch in the event of a disk failure during shipping.

(3) Ensure that the installation procedures are correct and complete and are in a deliverable format.

(4) Provide the contracting agency with adequate power and space requirements so that the system can be easily accommodated.

(5) Arrange with the contracting agency the method of shipment and schedule of arrival.

**Task 9: Deploy Demonstration System.** Task 9 covers the actual installation and verification of the GUARD-IT system software at the contracting agency's facility. We are making the assumption that the contracting agency can provide for the actual installation of the system hardware. If that is not a valid assumption, we can expand Task 9 to incorporate that level of effort. The deployment of the system will include sending the required personnel from TextWise to the contracting agency's facility for the duration of the system installation. During this period we will verify the system is operating as expected and provide demonstrations and training to agency personnel as required. At this time, all required manuals necessary to operate the system will be delivered to the contracting agency.

**Task 10: Project Coordination**

Task 10 covers overall coordination of the GUARD-IT project. This includes all aspects of project management including, but not limited to, schedule, cost, quality control, task management, management reports, providing required environment, etc. These tasks will

primarily be performed by the PI and the Project Manager, and may be delegated to others as deemed appropriate.

## G. RESULTS/PRODUCTS/TRANSFERABLE TECHNOLOGY

### G.1 Results

The GUARD-IT system will automatically detect whether any messages crossing a given domain violate the security policy corresponding to the domain. This system will use various natural language processing and knowledge base technologies to match the message contents to the semantic models of topics in the relevant security classification guide. The correspondence between the content of a message and the semantic model of a classified topic will determine whether the security policy would be violated by sending the message across the domain boundary. One component of the overall system is a policy violation detection effectiveness controller, which will allow the security officer to determine whether the categorization will be high recall or high precision. More importantly, messages that have to be manually categorized by the security officer will be fed into a machine learning component of the proposed system to improve the categorization effectiveness automatically. As the machine learning system is applied to more and more messages and as the rules for categorizing these messages are improved, the security officers' burden of manually inspecting messages will lighten. Eventually, the system will transition from one which requires human intervention to one which reliably and fully automatically can determine whether an outgoing message violates the prevailing security policy. In summary, the deployed GUARD-IT system will demonstrate that Artificial Intelligence technologies like Natural Language Processing can be applied to the real world problem of information assurance and that these technologies can dramatically improve boundary control effectiveness and greatly reduce the human resources required to perform this task.

### G.2 Products

The GUARD-IT system will be the world's first semantic boundary controller. The system will include clearly defined API's, so that it can be integrated within a large information assurance architecture. In addition to its obvious application to information assurance in a government

setting, the GUARD-IT system can also be used in a corporate environment. The transfer of inappropriate information such as hate messages or indecent materials from corporate email accounts can result in legal actions by the recipient. Such actions can eventually result in monetary losses and image tarnishing for the corporation. For this reason, it is crucial to filter messages that are sent to a site outside of the walls of the corporation. The GUARD-IT system will be able to perform just this task by providing an intelligent control mechanism based on an embedded natural language understanding technology.

Another possible application of the GUARD-IT system is its use as an automatic moderator of a Usenet newsgroup. More detail about this potential application can be found in the GUARD-IT system test and evaluation scenario described in the F. Statement of Work section.

G.3 Transferable Technology
There will be three key innovative technologies in the GUARD-IT system. The first is the knowledge extractor, which converts naturally occurring text such as emails and manuals into a formal knowledge representation. This representation can then be used to match texts on the basis of meaning (even if different words and syntax are used in the respective texts). Although the KNOW-IT system can currently extract meaning from newswire texts, it must be extensively modified before it can be applied to emails (which are often lacking in grammaticality and organization) and regulatory documents like manuals.

The second innovative technology is the Topic Parsing Semantic Tagger, which will convert security classification guides into functional components such as topic, classification level, declassification date, etc. using, as a base, natural language processing technology developed by TextWise LLC. The Topic Parsing Semantic Tagger will also disambiguate the content-bearing terms appearing in input text by assigning the appropriate WordNet synsets to each term.

The third technology is the Supervised Learner, which will be used to improve the effectiveness and automaticity of the overall system. The Supervised Learner will be a practical and large-scale operational system that can develop additional rules for categorizing outgoing messages on the basis of cases that have been explicitly reviewed by the security officer.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

## H. Milestone Schedule

| Milestone | Date Complete | Deliverable | Deliverable Product |
|---|---|---|---|
| Detailed System Architecture | 1/29/99 | YES | Detailed System Architecture Plan |
| Batch Processing Subsystem Complete | 10/22/99 | NO | |
| Real-Time Processing Subsystem Complete | 10/22/99 | NO | |
| System Integration of System without Supervised Learner | 11/19/99 | NO | |
| Complete Testing & Evaluation of Year 1 System | 2/25/00 | YES | Year 1 Test and Evaluation Report |
| Supervised Learner Subsystem Complete | 7/28/00 | NO | |
| System Integration of System including Supervised Learner | 8/25/00 | NO | |
| Complete Testing & Evaluation of Year 2 System | 11/3/00 | YES | Year 2 Test and Evaluation Report |
| Deployable Demonstration System Prepared | 12/15/00 | NO | |
| Deployment of Demonstration System Completed | 12/29/00 | YES | Full System Delivery |

Use or Disclosure of proposal data is subject to the restrictions on the cover page

## I. TECHNICAL PLAN

**I.1** Technical Approach

**(1) Technical Rationale:**

Natural Language Processing technology has successfully been applied to the tasks of Information Retrieval and Information Extraction. With respect to both of these tasks, systems which do justice to the syntactic, semantic, pragmatic, and discourse levels of language perform markedly better than systems which regard texts as unstructured bags of keywords. Since Boundary Control can be regarded as the categorization of natural language texts (viz. messages) into one of two classes (depending on whether the message is deemed to be in violation of security policy), it is reasonable to expect that the application of natural language processing to this problem will result in significantly more effective systems. In this document, the natural language processing, advanced boundary control system GUARD-IT is proposed. The GUARD-IT system will determine whether outgoing messages are potentially in violation of a classification guide by automatically constructing semantic models of classified topics and then comparing the meaning content of messages against these models. Messages whose meaning overlaps to a sufficient extent with a semantic model of a classified topic will be flagged as being in violation of security policy.

Because of the flexibility of GUARD-IT's natural language processing technology, this system can be a component in a wide variety of architectures. In particular, it can function as an enclave boundary controller and as a classification domain boundary controller. GUARD-IT will be able to convert any statement of security policy and any outgoing text messages into formal representations of content, and thus it can help to ensure that information is released on a "need to know" basis only and that the interface between different levels of security is effectively policed. In the context of the Information Assurance program, GUARD-IT will be embedded within an architecture provided by Trusted Information Systems (TIS). This architecture will be compliant with the overall security architecture of the NGII.

The core of the GUARD-IT system is the set of topic semantic models. These are generated automatically from electronic versions of classification guides. Typically these guides contain a list of topics and their corresponding classification levels. For example, the declassified

TRADOC Standard Security Classification Guide contains the following topic statements in its table of classified topics: "quantities of specific items of equipment", "weather impacts on operations", and "ammo expenditures". The construction of semantic models for topics like these is done in two stages. The first stage is to extract the topic statements from the classification guide. These topic statements are then parsed into their key concepts, and these concepts are expanded using a comprehensive lexical database. The parsed and expanded topic representations are then submitted as queries to DR-LINK, a natural language processing information retrieval system developed by TextWise LLC. A set of documents relevant to these queries will then be retrieved from a collection of text segments of military manuals and statements of military doctrine. This is the first stage of the construction of the topic model, and it is essentially a matter of using natural language processing and information retrieval to generate a set of text segments that are closely related to the meaning of a topic. These text segments expand the representation of the corresponding topic in various ways, e.g. by providing examples of the topic, by indicating synonymous phrasings of the topic, etc.

The second stage of topic semantic model construction is to extract structured knowledge representations from the retrieved set of text segments. The base technology for this extraction is the KNOW-IT system, which is being developed within DARPA's High Performance Knowledge Base program. KNOW-IT can successfully convert news type texts into concept-relation-concept triples (or CRCs), a generalized representation of the structure and meaning of each text. For the GUARD-IT project, this core functionality will be tailored to text types appropriate for the task. In particular, it will be tuned to the extraction of information from classification guides, military doctrine, and email messages. The set of CRCs extracted from the text segments will then constitute a semantic model of the structured meaning of the corresponding topic.

Since the tuning of KNOW-IT to regulatory text types may require substantive revisions of the underlying extraction technology, J. Bret Michael, an expert in the field of formalizing policy, will be retained as a consultant for this project. Michael's contribution to the GUARD-IT system will be to suggest broad, theoretically motivated modifications of the underlying knowledge representation and of the rules which convert regulatory texts into formulas of the knowledge

representation. These modifications will, it is hoped, enable more accurate matches between topic semantic models and the representations of outgoing messages.

Before progressing to a discussion of how classification topics are matched against messages, it is important to be clear about how the underlying technology works. DR-LINK (Document Retrieval using Linguistic Knowledge) is a natural language information retrieval system developed over the past 8 years by Dr. Liddy and colleagues of TextWise LLC with support from DARPA. Venture capital funding provided by Manning and Napier Information Services has successfully productized this system and brought it to market.

The underlying principle of the DR-LINK system is that text retrieval must occur at the conceptual level, not the word level. That is, a successful retrieval system must retrieve on the basis of what people mean in a query, not simply the words they state in their query. The same is true of documents - their meaning must be captured at the conceptual level of human expression. In order to achieve conceptual level representation of texts, DR-LINK detects both domain-independent and domain-dependent linguistic patterns that reveal relationships and meaning. DR-LINK provides rich, deep processing of text by representing and matching documents and queries at the lexical, syntactic, semantic and discourse levels. The system is modular and performs staged processing of documents, with each module adding a meaningful annotation to the text. For matching, a query undergoes analogous processing to determine the requirements for document matching. Modularity allows for easy adaptation of the system and for empirical evaluation of each module's performance.

The Document Preprocessing module of DR-LINK converts raw data files into a uniform format suitable for further processing by the DR-LINK system. Preprocessing involves some discourse-level manipulation of text, such as the decomposition of documents into their appropriate subtexts. All text is annotated with pseudo-SGML tags that include <caption>, <date>, <headline>, <source>, and <text>.

The Document Processing module segments input text, brackets phrases, and assigns syntactic and semantic tags to the text elements. This processing of input text is a fundamental precursor

Use or Disclosure of proposal data is subject to the restrictions on the cover page

to later document-query matching.  Documents are first processed with the End-of-Sentence program, which segments the text on a sentence-by-sentence basis.  This is followed by the part-of-speech tagger, which identifies a total of 48 grammatical forms and punctuation marks.  Using the output from the part-of-speech tagger, the Subject Field Coder module tags content bearing words in input text with a unique subject code.  This is done with the aid of an electronic lexical resource that groups words into the broad subject categories that they can express.  Since words in the English language have on average about 1.5 senses (with the most commonly occurring nouns having an average of 7.3 senses and the most commonly occurring verbs having an average of 12.4 senses (Genter, 1981)), disambiguation is required in determining a single subject code for each word.  After the assignment of subject codes, these codes are combined to produce a fixed-length, subject-based vector representation of the document's content.

Proper nouns, group proper nouns (e.g. the Far East) and group common nouns (e.g. anti-cancer drugs) are recognized as important sources of information for detecting relevant documents in information retrieval (Liddy et al, 1994b).  DR-LINK first locates the boundaries of proper noun phrases using the part-of-speech tags mentioned above.  Heuristics developed through corpus analysis are applied to bracket proper noun phrases that contain embedded conjunctions and prepositions (e.g. Department of Defense, Centers for Disease Control and Prevention).

After proper nouns have been bracketed, they are classified into thirty seven broad, semantic categories, which account for roughly 90% of all proper nouns.  Classification occurs in the following order.  First, proper noun suffixes, prefixes, and infixes (e.g. Hospital, Senator, Professor) are examined for possible clues about the category of the proper noun.  The proper noun is then passed to a database to determine if an alternative, standard form exists (e.g. 'President Bill Clinton' instead of 'Bill Clinton').  If the proper noun is an alias, the standard form is used for categorization.  In the next stage, proper names are compared to a database of significant personal names for a possible match.  Any matching proper names are classified as referring to people.  The proper noun is then subjected to context heuristic tests.  For example, if the the proper noun is immediately followed by a comma and a state, county or country name, then the proper noun is identified as town, city or other geographical entity.  Information gleaned from appositional clauses is also used in the categorization process.  Numerous other heuristics

Use or Disclosure of proposal data is subject to the restrictions on the cover page

are applied until the proper noun has been tested for inclusion in one of the 37 categories. The roughly 10% of proper nouns that remain uncategorized are assigned to the miscellaneous category.

Complex nominals (e.g. 'budget amendment bill' and 'central nervous system') are important information-bearing phrases detected by the DR-LINK system and used in the document-query matching process. Complex nominal phrases are recognizable as adjacent sequences of nouns and non-predicating adjectives. These sequences can be recognized from the part-of-speech tags assigned to the input text.

This should clarify the role that DR-LINK will play within the GUARD-IT system. DR-LINK will be used to retrieve documents which yield key concepts that enrich the representation of classified topics. In subsequent phases of the project, the scope of the GUARD-IT system can be enlarged by integrating the cross-language information retrieval system CINDOR, also developed by TextWise LLC. The CINDOR system can retrieve relevant documents in Spanish and French, as well as English (with further languages to be added in the future). The addition of this functionality to the system would enable information assurance in a joint task effort involving countries which do not share a common language.

Aside from DR-LINK, the other major component of GUARD-IT is the KNOW-IT system. KNOW-IT is being developed within DARPA's High Performance Knowledge Base (HPKB) program, and it is an information extraction system which is designed to process texts such as those produced by Reuters, the Associated Press, the Wall Street Journal, and the Financial Times. KNOW-IT accepts raw newswire text as input and extracts semantic relations between the concepts expressed in these texts. These concepts and relations provide a representation of the meaning expressed by the text.

The extractions generated by KNOW-IT can be illustrated with a simple example:

Rupert Murdoch owns Fox which is a subsidiary of News Corp.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

The content of this sentence can be represented by the following concept-relation-concept triples:

AGNT(own, Rupert Murdoch)
OBJ(own, Fox)
ISA(Fox, subsidiary)
OBJ(subsidiary, News Corp.)

These four concept-relation-concept triples (or CRCs) mean, respectively, that Rupert Murdoch is an agent of a state of owning, that Fox is the object of this owning, that Fox is a subsidiary, and that News Corp. is the object of this subsidiary relation. Thus, the four concept-relation-concept triples perspicuously and precisely capture a substantial portion of the content expressed by the sentence.

The relations used in CRCs are based on the list of conceptual relations provided in (Sowa, 1984). This list includes case roles, e.g. AGNT (agent), OBJ (object), and EXPR (experiencer), modal operators, and tense operators. Although this list has been an indispensable reference in the development of the KNOW-IT system, it has also been extensively revised in the effort to craft extraction rules and on the basis of insights gleaned from formal evaluations. Furthermore, the KNOW-IT development team has applied Occam's Razor whenever possible and has pared down the repertoire of relations to the minimal set needed to capture all of the topical content expressed by text. The reason for this is twofold: to increase the accuracy of the CRCs extracted and to allow for maximal flexibility in matching queries submitted to the question-answering system with text segments processed by the extraction subsystem. As will be demonstrated below, this flexibility is crucial in the present context, where the aim is to match topic semantic models with message semantic models. Three examples of relations used in the KNOW-IT system follow.

**AFFL (affiliation)** - there is some sort of close relationship between the two concepts. For example, AFFL(Ken Shaw, Syracuse University) means that Ken Shaw is affiliated with Syracuse University.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

**ISA (is a)** - the subject concept is a member of the set denoted by the object concept.  For example, ISA(Bill Clinton, leader) means that Bill Clinton is a leader.

**LOC (location)** - the subject concept is found in the location denoted by the object concept.  For example, LOC(Statue of Liberty, New York) means that the Statue of Liberty is located in New York.

The semantic model for a given topic statement essentially constitutes a releasability template for the topic statement.  The major component of the topic model is the set of CRCs extracted from the enriched representation of the topic.  These CRCs provide a very detailed and structured map of the meaning of the topic.  This map can encompass exemplifications of the topic, explanations of the topic, paraphrasings of the topic, etc.  The second component of the topic model is a tag denoting the classification level associated with the topic.  Note that the more fine-grained these classification tags are, the more sensitive the releasability template will become.  Given the topic semantic models and their associated classification tags, GUARD-IT's approach to boundary control is to compare these models against the representations of outgoing messages.  If there is a match and if the classification level of the topic model exceeds that of the sender or the recipient, then the message is barred from release.

The classification of outgoing messages proceeds as follows.  The original outgoing message will first be stored in a message database, so that there is a permanent audit trail.  Then the message will be parsed for meta-information such as sender, receiver, and date of message issuance.  After this, the sender's classification level and the receiver's classification level will be retrieved from a database.  Next, the knowledge extractor will extract CRCs from the message. This set of CRCs comprises the structured, meaning representation corresponding to the message.  Finally, this set of CRCs is compared with topic models on the basis of a similarity metric.  There are three possible outcomes of this comparison.

(1.)  If there is a topic model which exhibits a high degree of similarity with the message and whose classification level is above the clearance level of the sender or recipient, then the message is routed to a database of violating messages.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

(2.) If there is no topic model whose classification level is above the clearance level of the sender or recipient and whose similarity to the message is above a certain threshold value, then the message is routed to the recipient.

(3.) In all other cases, the message is routed to the security officer for manual inspection. The security officer will make a final determination about whether the content of the message indeed is at variance with security policy. Messages which survive this manual inspection will then be routed to their destination.

Messages which must be manually inspected will be presented to the security officer in a manner which will permit efficient and effective determination about whether the messages violate security policy. Messages which matched on a topic model but whose similarity score was in the middle region will be displayed as three parts. The first part will be the topic corresponding to the topic model which matched the message, the second part will be the classification level associated with this topic, and the third part will be the text segment from the message which matched the model. In most cases, this should be enough information for the security officer to make a decision. If it is not, he can query for an explanation of why the message matched on the topic model, and a window will appear which shows the correspondence between the message and the topic model.

As an example of how messages will be matched against topic models, consider the topic statement 'Threat Force Organization: composition' (from the TRADOC Standard Scenario Security Classification Guide) and its descriptive example 'the enemy is composed of 2,600 tanks'. In this case, 'tanks' and '2,600' would be generalized, respectively, to military hardware type and numeric concept type. Accordingly, the meaning of the topic statement would be represented by three general concepts, viz. enemy type, military hardware type, and numeric concept type. The structure of the topic statement would be represented by a network of semantic relations between these three concepts. Given this representation of the topic statement, there would be a match between it and a message containing the text fragment 'Iraq

Use or Disclosure of proposal data is subject to the restrictions on the cover page

has 400 fighters', because 'Iraq', '400', and 'fighters' were respectively typed as an enemy concept, a numeric concept, and a military hardware concept.

A core element of the GUARD-IT system is the similarity metric, which assesses the degree of similarity between a topic model and the set of CRCs extracted from a message. The optimal formula for this metric will have to be determined by intensive training/testing of the system. Since it may be difficult to procure appropriate classification guides and military manuals, the system will be trained on newsgroup messages. More specifically, the system will be trained to distinguish between messages which are appropriate to a particular newsgroup and those which are not. Since there is a clear isomorphism between inappropriate newgroup postings and messages with classified content, a metric which can determine for a broad range of cases which messages are appropriate/inappropriate for a newsgroup should also reliably discriminate between classified and unclassified material.

To test the effectiveness with which GUARD-IT performs these tasks, a baseline and evaluation metrics are necessary. To obtain a baseline, TextWise LLC will procure a license to the Integralis MIMESweeper COTS product. This content-security software has many features, among them a keyword search engine which scans outgoing messages for "dirty words" and routes the message depending on what it finds. Since this is the current state-of-the-art in boundary control, it represents a suitable baseline for testing the GUARD-IT system. To conduct the test, topics from a classification guide will be entered into the MIMESweeper keyword list, and this same guide will be processed by the GUARD-IT system. The test will then be evaluated on the basis of the standard Information Retrieval evaluation metrics of precision and recall. The GUARD-IT system categorizes all outgoing messages into one of three classes: clear violation of the classification guide (BAD messages), clear non-violation of the classification guide (GOOD messages), and an "I don't know" category. Thus, the precision of the system would be the number of correctly classified messages in the GOOD and BAD categories divided by the number of messages in these two categories, and the recall of the system would be the number of correctly classified messages in the GOOD and BAD categories divided by the total number of messages in all three categories. These results can then be easily compared to the figures for the MIMESweeper system. The comparison of the results from the two systems will provide a clear

Use or Disclosure of proposal data is subject to the restrictions on the cover page

indication of whether and the extent to which GUARD-IT represents an advance over the current state of the art.

Since there is generally a trade-off between precision and recall (higher precision usually means lower recall and vice versa), the developers of GUARD-IT will explore the possibility of allowing the user to set the optimal precision/recall levels for a particular application of GUARD-IT. This would be a desirable feature, because the trade-off between precision and recall in this context is essentially a matter of striking a balance between work load and risk of disclosure. The lower the recall and the higher the precision, the more work for the security officer in reviewing messages in the "I don't know" category but the less risk that a BAD message will find its way beyond the guard. In the limiting case, the recall would be zero, and the "I don't know" category would include all messages. This would mean that the work load would not be reduced, but there is also no risk of disclosure (because a human has to review all documents).

After the security officer has reviewed a message in the "I don't know" category and made a determination about whether or not it violates the security policy, the message is copied to a special database. When this database is sufficiently large, a machine learning system is run over all of the records in the database and a decision tree is automatically constructed from these cases. The decision tree will consist of a set of rules for moving messages from the "I don't know" category into the GOOD and BAD categories. Two versions of the system can then be compared: one which uses the classification model and one which does not. It is hoped that in most cases the classification model will improve the recall and/or precision of the system, and thus, after several iterations of machine learning, the "I don't know" category will tend to shrink and the GOOD and BAD categories will tend to grow and contain fewer incorrect cases. This means that the machine learning component will not only tend to improve the precision/recall of the system; it will tend to make the system more automatic. As the "I don't know" category gets smaller and smaller, there will be less and less work for the security officer to do. Thus, the initial implementation of the system will become more fully automatic as a corpus of correctly categorized cases is acquired and fed back to the system. If the machine learning component of

Use or Disclosure of proposal data is subject to the restrictions on the cover page

GUARD-IT is sufficiently successful, the system will in fact transition from an interactive guard to a fully automated guard.

The machine learning system to be used in this project is the C4.5 program (Quinlan, 1993). This proven program constructs a classification model from a large range of prior cases. For example, when given a set of structured attribute-value pairs about Canadian contract negotiations in 1987-1988, the program can construct a procedure for classifying these cases into one of two categories: those that resulted in an acceptable contract and those that resulted in an unacceptable contract (Quinlan, 1993). The classification model constructed by C4.5 has the form of a decision tree. A decision tree is a graph (more precisely, a directed, acyclic graph (or DAG)), each of whose nodes contains a test to be applied to a case and each of whose leaves corresponds to a class to which a case is assigned. The cases from which C4.5 induces a decision tree consist of a set of attribute-value pairs and the class to which the case belongs. The assumption is that the attribute-value pairs explain/predict the membership of the case in the class. When given a sufficiently large number of cases, whose form has been antecedently specified, C4.5 will induce a decision tree which correctly classifies these cases and which predicts the class to which any new case will belong.

Before running C4.5 over a set of cases, it is essential to specify the form of the cases and the classes to which these cases are assigned. With regard to the envisioned project, the attribute-value pairs will relate to crucial properties of the semantic model of message and topic, and the classes will, of course, be the GOOD messages and the BAD messages. A priori, it is impossible to say which properties of semantic models will be most useful for explaining/predicting the inclusion of a case within a class. However, one property which suggests itself is the semantic classes of the concepts in CRCs. These semantic classes could take the form of the unique beginners the WordNet lexical database. The unique beginners are 24 high-level concepts which capture the very general meaning of common nouns. As for proper nouns, we anticipate using the proper noun categories assigned by the KNOW-IT document processing system. These categories number less than a dozen and include: geographic entity, affiliation, organization, and human. One advantage of using the abstract classes to which the concepts can be mapped rather than the concepts themselves is that there will not be a combinatorial explosion of cases.

administrative information. These messages are then indexed on the basis of these functional fields and stored in the Outgoing Message Database (12.). This database is used during the message classification process and also provides an audit trail of messages. After this database is updated, the text field of each message is processed by the Knowledge Extractor (13.), which converts the text into the message semantic model. It is important to note that the Knowledge Extractor incorporates the same design as the Knowledge Extractor (8.) used to generate the topic semantic models. Using the same mechanism in both the Batch Processing Subsystem and the Real-time Processing Subsystem ensures that messages and topics with the same meaning will be represented with the same structure, even when they are phrased quite differently.

The message semantic model is then passed to the KNOW-IT matcher (14.), which assesses the similarity between this model and each of the topic semantic models. The similarity measure will be based on the matching algorithm used in the question-answering subsystem of KNOW-IT, which matches query representations against representations extracted from sentences of newswire text. If there is at least one topic model which exhibits a high degree of similarity with the message and whose classification level is above the clearance level of the sender or recipient, then the message is routed to the Rejected Message Database (19.) and treated according to the predefined policy. If there is no topic model whose classification level is above the clearance level of the sender or recipient and whose similarity to the message is above a certain threshold value, then the message is routed to the POP mail server (15.) (these messages are considered to be Filtered Outgoing Messages (16.). In all other cases, the message is routed to the Security Officer (20.) for review through the Message Inspector (18.). The Message Inspector will display the message, the topic that matched this message, and an optional explanation of why the topic matched the message. The Security Officer can review this information and determine whether the message violates the policy embodied in the security guide. Messages which are deemed to violate established security policy are routed to the Rejected Message Database and later used for further improvement of the system.

Copies of messages which have been manually categorized by the Security Officer are sent to the Supervised Learner (17.), which is a machine learning subsystem. The Supervised Learner will induce a classification model from this corpus of message copies, once it is sufficiently large,

Use or Disclosure of proposal data is subject to the restrictions on the cover page

and this classification model can then be used to improve the precision and/or recall of the system as a whole.



## Selected Publications

Paik, W., Liddy, E.D., Yu, E.S. & McKenna, M. (1996). Categorizing and standardizing proper nouns for efficient information retrieval. Corpus Processing for Lexicon Acquisition. MIT Press.

Liddy, E.D., Paik, W., McKenna, M. & Yu, E.S. (1995). A natural language text retrieval system with relevance feedback. Proceedings of the 16th National Online Meeting.

Liddy, E.D., Paik, W. & McKenna, M. (1995). Development and implementation of a discourse model for newspaper texts. In Proceedings of the AAAI  Symposium on Empirical Methods in Discourse Interpretation and Generation. Stanford, CA.

Liddy, E.D. (1995). Development and implementation of a discourse model for newspaper texts. Proceedings of the Dagstuhl on Summarizing Text for Intelligent Communication. Saarbruken, Germany.

Liddy, E.D. & Myaeng, S.H. (1994). DR-LINK System: Phase I Summary. Proceedings of the TIPSTER Phase I Final Report.

Liddy, E.D., Paik, W., Yu, E.S. (1994). Text categorization for multiple users based on semantic information from a MRD. ACM Transactions on Information Systems.

Liddy, E.D., Paik, W., Yu, E.S. & McKenna, M. (1994). Document retrieval using linguistic knowledge.  Proceedings of RIAO '94 Conference.

Liddy, E.D., Jorgensen, C.L., Sibert, E.E., Yu, E.S. (1993).  A sublanguage approach to natural language  processing for an expert system.  Information processing and management.

Liddy, E.D. (1993). An alternative representation for documents and queries. Proceedings of the 14th National Online Meeting.

Paik, W., Liddy, E.D., Yu, E.S. & McKenna, M. (1993). Categorizing and standardizing proper nouns for efficient information retrieval.  Proceedings of the ACL Workshop on Acquisition of Lexical Knowledge from Text.

Liddy, E.D., McVearry, K., Paik, W., Yu, E.S. & McKenna, M. (1993). Development, implementation & Testing of a Discourse Model for Newspaper Texts. Proceedings of the ARPA Workshop on Human Language Technology, Princeton, NJ, March 21-24, 1993.

Liddy, E.D. & Paik, W. (1992).  Statistically-guided word sense disambiguation. In Proceedings of AAAI Fall '92 Symposium on Probabilistic Approaches to Natural Language.  Boston.

Liddy, E. D. (1991). The discourse-level structure of empirical abstracts: An exploratory study. Information processing and management,  27:1, pp. 55-81.

Use or Disclosure of proposal data is subject to the restrictions on the cover page

Liddy, E.D. & Paik, W. (1991). An intelligent semantic relation assigner. <u>Proceedings of Workshop on Natural Language Learning</u>. Sponsored by IJCAI '91, Sydney, Australia.

Liddy, E. D. (1990). Anaphora in natural language processing and information retrieval. <u>Information processing and management.</u> 26:1 pp. 39-52.

Liddy, E.D. (1988). <u>The discourse-level structure of natural language texts: An exploratory study of empirical abstracts</u>. (Doctoral dissertation, Syracuse University).

Mitchell, Tom M. <u>Machine Learning</u>. The McGraw-Hill Companies: New York, 1997.

Paik, Woojin. Chronological Information Extraction System. In <u>Proceedings of the Dagstuhl Seminar on Summarizing Text for Intelligent Communication</u>. Saarbrucken, Germany, 1994.

Quinlan, J. Ross. Discovering Rules by Induction from Large Collections of Examples. In D. Michie (Ed.), <u>Expert Systems in the Micro Electronic Age</u>. Edinburgh University Press, 1979.

--------------. Learning Efficient Classification Procedures and their Application to Chess End Games. In R. S. Michalski, J. G. Carbonell, and T. M. Mitchell (Eds.), <u>Machine Learning: An Artificial Intelligence Approach</u>. San Mateo, California: Morgan Kaufmann Publishers, 1983.

--------------. <u>C4.5: Programs for Machine Learning</u>. San Mateo, California: Morgan Kaufmann Publishers, 1993.

Sowa, John. <u>Conceptual Structures: Information Processing in Mind and Machine</u>. Reading, MA: Addison-Wesley, 1984.

### I.2 <u>Plan of Work</u>

Full details of program execution have been incorporated into the Task Requirements descriptions (Subsection F.4) included as part of the Statement of Work. The GANTT Chart on the following page provides an overview of Tasks and Scheduled Start/End dates.

**Use or Disclosure of proposal data is subject to the restrictions on the cover page**

| Task ID | Task Name | Duration | Start |
|---|---|---|---|
| 1. | Design Detail System Architecture | 4 wks | Fri 1/1/99 |
| 2. | Develop Batch Processing Subsystem | 199 days | Fri 1/29/99 |
| 2.1. | Adapt DR-LINK Indexer to process military manuals or doctrines | 6 wks | Fri 1/29/99 |
| 2.2. | Develop Topic Parsing Semantic Tagger | 6 wks | Fri 3/12/99 |
| 2.3. | Adapt DR-LINK Matcher to use security topic on the queries | 6 wks | Fri 4/23/99 |
| 2.4. | Develop Knowledge Extractor to build Topic Semantic Model KB | 18 wks | Fri 6/4/99 |
| 2.5. | Integrate Batch Processing Subsystem | 4 wks | Fri 9/24/99 |
| 3. | Develop Real-time Processing Subsystem | 390 days | Fri 1/29/99 |
| 3.1 | Develop Meta Information Interpreter | 4 wks | Fri 1/29/99 |
| 3.2 | Develop Outgoing Message DB | 4 wks | Fri 2/26/99 |
| 3.3. | Develop Knowledge Extractor to process Outgoing Messages | 16 wks | Fri 3/26/99 |
| 3.4. | Integrate KNOW-IT Matcher | 4 wks | Fri 7/16/99 |
| 3.5. | Develop Message Inspector | 6 wks | Fri 8/13/99 |
| 3.6. | Integrate Real-time Processing Subsystem without Supervised Learner | 4 wks | Fri 9/24/99 |
| 3.7. | Develop Supervised Learner | 90 days | Fri 2/25/00 |
| 3.7.1. | Prepare Training & Test Data | 4 wks | Fri 2/25/00 |
| 3.7.2. | Develop Learning Model | 8 wks | Fri 3/24/00 |
| 3.7.3. | Test the Learning Model | 6 wks | Fri 5/19/00 |
| 3.8. | Integrate Real-time Processing Subsystem | 4 wks | Fri 6/30/00 |
| 4. | Integrate Overall System without Supervised Learner | 4 wks | Fri 10/22/99 |
| 5. | Integrate Overall System with Supervised Learner | 4 wks | Fri 7/28/00 |
| 6. | Develop Test Environment - Year 1 | 70 days | Fri 11/19/99 |
| 6.1. | Develop Test and Evaluation Plan | 4 wks | Fri 11/19/99 |
| 6.2. | Install GUARD-IT system | 3 wks | Fri 12/17/99 |
| 6.3. | Install Baseline system | 3 wks | Fri 1/7/00 |
| 6.4. | Conduct Year 1 Comparative Evaluation | 4 wks | Fri 1/28/00 |
| 7. | Develop Test Environment - Year 2 | 60 days | Fri 8/25/00 |
| 7.1. | Revise Test and Evaluation Plan | 4 wks | Fri 8/25/00 |
| 7.2. | Re-install GUARD-IT system | 2 wks | Fri 9/22/00 |
| 7.3. | Conduct Year 2 Comparative Evaluation | 4 wks | Fri 10/6/00 |
| 8. | Prepare Deployable Demonstration System | 6 wks | Fri 11/3/00 |
| 9. | Deploy Demonstration System | 2 wks | Fri 12/15/00 |
| 10. | Coordination | 100 wks | Fri 1/29/99 |

**Resources:**

PI:  Principal Investigator
SR:  Senior Researcher
SSE: Senior Software Engineer
SE:  Software Engineer
AN:  Analyst

### I.3  Comparison to Related Work

Work which is related to the GUARD-IT system can be found within the general areas of content security and boundary control.   It has been recognized by a number of commercial software vendors that it is necessary to develop systems which examine what is in the data stream of outgoing traffic.   Software products based on this orientation are designed to deal with data originating in the local network and destined for the outside world.   Firewall servers, in contrast, are designed to control access to the local network from external sites.

One popular COTS product is MIMEsweeper by Content Technologies Inc.   The state-of-the-art technique employed in this and other boundary control software is simple keyword (or "dirty word") detection in messages.   The users of the system need to provide an explicit list of keywords, and the system will then search for these words and flag any messages containing them.   This approach is lexically based and is quite primitive in comparison to the natural language processing techniques embedded in GUARD-IT.   These techniques permit meaning-based, conceptual-level comparison between outgoing messages and security classification topics.

### J.  DEMONSTRATION & INTEGRATION PLANS

### J.1  Demonstration

As explained in the System Overview, the Supervised Learner is a core component of the GUARD-IT system; it enables this system to improve its identification of inappropriate transfers of classified information in outgoing messages.   It is proposed that this capability of the system be demonstrated.   However, the messages used in this demonstration will not be emails, for two reasons.   First, it will not be an easy task to collect a sufficient number of emails.   Second, it is reasonable to assume that classified information is expressed only very infrequently in emails.   For these reasons, if emails are used in the evaluation and demonstration of the system, there will be a paucity of data.   To overcome this problem, the following alternative scenario is proposed.

This alternative scenario concerns commercially available hardware and software and is isomorphic to the case of a boundary controller policing the interface between two classification

**Use or Disclosure of proposal data is subject to the restrictions on the cover page**

domains.  The first step in this scenario is to construct a simulated security classification guide for such hardware or software.  The development of this simulated guide will be motivated by analysis of declassified hardware and software security classification guides from the DOD. Preliminary observations of these guides have revealed that usually specific/detailed information is classified while general/abstract information is unclassified.   By examining additional declassified classification guides, it will be possible to create a simulated security classification guide for commercially available software or hardware.  The product of this first stage of the scenario will be input to GUARD-IT to create topic semantic models.

The second stage of the scenario concerns the collection of outgoing messages.  As luck would have it, much commercially available software and hardware is actively discussed in Usenet newsgroups.  For example, there are special newsgroups dedicated, respectively, to Solaris and the Macintosh Powerbook.  By capturing all of the postings from one newsgroup, it will be possible to build up a large corpus of messages about a particular software or hardware product. These messages can then be input to the GUARD-IT system, which can match the messages against the topic semantic models and determine which are in violation of the classified topics. Thus, the people who submit messages to the newsgroup can be considered as one domain, and the newsgroup itself can be considered as another domain, and the boundary between these two domains is controlled by the GUARD-IT system.

Using the mock security classification guide and the corpus of messages harvested from an appropriate newsgroup, the GUARD-IT system will be trained to classify messages on the basis of the method described in Task 3.7 Develop Supervised Learner in section F.4 Task/Technical Requirements.  The trained GUARD-IT system will then be demonstrated using predetermined test data as well as real-time updated messages from the selected newsgroup (since new messages are posted to newsgroups every hour).

**J.2** Integration
TextWise will build the test environment by simulating a domain boundary which separates the external world from the internal network.  The simulation will be based on the use of a real domain which is connected to the Internet, and the domain will consist of a series of servers such

as a firewall server, a POP mail server, and the GUARD-IT server. These servers will be connected to test clients via a real LAN hub. This environment will be used to evaluate the GUARD-IT system against commercially available guard software. All software and hardware used to build the test environment will be delivered to the government for further demonstration and testing at the end of the contract.

As for integration of the GUARD-IT system, all software developed in this project will be installed as an integrated software suite. Furthermore, TextWise has entered into an agreement with Trusted Information Systems (TIS) to use the GUARD-IT system as a component of an overall domain boundary controller developed by TIS. This domain boundary controller will comply with all DOD regulations governing system deployment. Thus, TIS will integrate the system and install it within the selected government site and ensure that this integration and installation satisfy the requirements and goals of Information Assurance.

## K. RELEVANT CAPABILITIES

### K.1 Facilities

The proposed research project will be carried out in TextWise office and laboratory space in the Science & Technology Center, a component of the New York Center for Advanced Technology in Computer Applications and Software Engineering (CASE Center). The available physical facilities consist of 2689 square feet of laboratory and administrative space in the Science & Technology Center that also provides a range of power, telecommunication, and office/administrative infrastructure assistance. Principal research facilities consist of the following resources:

- Multiple Sun Servers with 200 gigabytes of storage:
- Multiple Workstations & PC's
- Internet Access - TI (TI line to/from Syracuse to MNIS facilities in Rochester):
- A TI line for Internet access
- 56 K direct connection from TextWise facilities in Syracuse
- Production facilities @ MNIS available to us on an as needed, non-interference basis:
- Several Multi-processor Servers

Use or Disclosure of proposal data is subject to the restrictions on the cover page

- Multiple daily newsfeeds from national and international sources
- Software products including:
- System Design Software - Objecteering
- Configuration Management - SCCS, RCS, MS SoftSafe
- Integrated Development Environment - SUN Workshop for C/C++
- Web Development - FrontPage , Visual Cafe
- PERT & Activity Charting - MS Project

In addition to the above TextWise has, in virtue of its location in the Science & Technology Center, access to the resources of the Northeast Parallel Architecture Center (NPAC) as well as a variety of academic research resources available through Syracuse University. Additionally, the CASE Center makes available meeting space, classrooms, and multi-media facilities as needed.

## K.2  Related Accomplishments

This proposal represents a natural extension of an ongoing research agenda at TextWise, LLC. Dr. Liddy, President/CEO of TextWise, has worked for over 10 years in information retrieval and natural language processing.    During the last 10 years Dr. Liddy has been principal investigator or co-principal investigator on over 25 research programs, with total awards exceeding $9 million.

Much of the early work at TextWise concentrated on the development of DR-LINK. The document processing system for GUARD-IT will be based on DR-LINK processing modules. DR-LINK is a state-of-the-art linguistically based information retrieval system, or intelligent text retrieval system. The DR-LINK system has been demonstrated to be superior in retrieving answers from full text databases. The Patent and Trademark Office reports that they consistently find documents using DR-LINK they have otherwise been unable to find. DR-LINK derives this capability by understanding information in text at the multiple levels at which human beings understand it: the morphological, lexical, syntactical, semantic, pragmatic, and discourse levels of human understanding. In order to get at the underlying knowledge, it searches not only on synonyms, but also on phrases and concepts in the documents. It can differentiate between facts and predictions, between future and past events and between completed and ongoing events.

Information extraction and semantic representation of content will be performed using a modified version of KNOW-IT, the TextWise information extraction software. KNOW-IT is an

Use or Disclosure of proposal data is subject to the restrictions on the cover page

integrated knowledge extraction and organization system that takes as input both raw text and structured knowledge bases in any subject domain, to create a structured knowledge base automatically. Because both the knowledge extraction and the creation of subject hierarchies are performed automatically, knowledge bases can be built quickly, making the system useful for solving problems in real time.   Our information retrieval and extraction products create knowledge bases automatically. They are not domain-specific. By basing these products on the rules of language, rather than on the specialized knowledge of each domain, we are able to extract information from multiple domains with no need to develop a base of specialized knowledge before start-up.

Other research projects include evidence combination from heterogeneous sources, summarization of text across documents, and the Conceptual Interlingua Document Retrieval (CINDOR) system that extends our NLP-based technologies into multilingual environments. Current CINDOR research efforts work.


### K.3   Key Personnel & Subcontractors/Consultants

**Dr. Elizabeth DuRoss Liddy.  President/CEO, TextWise, Professor, Syracuse University**
GUARD-IT will come under the oversight of Dr. Liddy, who, as President/CEO of TextWise, participates in and leads each project.  Dr. Liddy was the progenitor of the DR-LINK text retrieval system and the co-Principal Investigator and Project Manager of the DR-LINK project under the ARPA TIPSTER initiative. Over the last 10 years Dr. Liddy has gained extensive experience directing research and developing projects, including several SBIR efforts that have matured to commercial products. She has published extensively in the field of natural language processing and information retrieval.

Dr. Liddy is President/CEO and Co-Founder of TextWise, an innovative intelligent information retrieval start-up company which is transferring the technology of her text retrieval research into products in the commercial world. It is supported by substantive business investments, as well as government research and SBIR grants. She is also a Professor in the School of Information Studies at Syracuse University, from which she received her Ph.D. in Information Science in 1988~ Her dissertation research entailed the development of a frame-based model of scientific abstracts based on the cognitive models of experts and a linguistic analysis of sample texts. The dissertation won three national and/or international awards in the field of Information Science.

Dr. Liddy's current research focuses on the use of natural language processing for a variety of information analysis tasks, particularly information retrieval. She is the author of approximately 60 published papers, has made numerous invited presentations to scholarly or research organizations and has consulted for organizations striving to improve their access to information or to develop innovative information products. She has also conducted tutorials in the use of natural language processing for information retrieval at the annual conferences of both the Association for Computing Machinery (ACM) and ACL.

Availability: GUARD-IT 10% / Other Programs Commitments - 12%

**Woojin Paik. Director of Research, TextWise LLC.**

Mr. Paik is presently the Director of Research and Development for TextWise, LLC where he manages the overall research agenda for the company and acts as the technical lead on a number of current projects.   One such project, the CHronological information Extraction SyStem (CHESS) is an Air Force Small Business Innovation Research Phase II project that moves information retrieval beyond the boundaries of document-based retrieval. By extracting knowledge building blocks from text, this system automatically creates a knowledge base which aggregates information about any named entity--people, places, events, organizations, companies or ideas—and organizes that knowledge into a timeline which covers the entire period of the knowledge base. The Phase II CHESS effort is currently nearing completion and will undergo initial commercialization as part of a recently negotiated Cooperative Research & Development (CRDA) with the Information Directorate of the Air Force Research Laboratory.

Mr. Paik is also the technical lead on the KNOWledge-based Information Tool (KNOW-IT) project, a part of the DARPA HPKB program. KNOW-IT is an integrated knowledge extraction and organization system that will be able to take as input both raw text and structured knowledge bases in any subject domain and create a combined knowledge base from them. By automating the process of structuring knowledge and making it accessible, KNOW-IT will solve the problems of time consuming manual input and organization. Because both the knowledge extraction and the creation of ontologies, or hierarchical structures, is automated, knowledge bases will be built quickly making the system useful for solving problems in real time.

Under the direction of Dr. Liddy, Mr. Paik has worked as a Research Assistant on the Advance Research Project Agency (ARPA) funded DR-LINK Project. He conducted research in the

Use or Disclosure of proposal data is subject to the restrictions on the cover page

natural language processing component of the DR-LINK document detection system. Mr. Paik has also taught introductory level courses as an adjunct faculty member in Syracuse University's School of Information Studies. Mr. Paik is currently completing the requirements for his Ph.D. in Information Transfer from Syracuse University and also holds a B.S. in Civil Engineering from Yonsei University in Seoul, South Korea.

Availability: GUARD-IT 50% / Other Programs Commitments - 50%

### Subcontractors / Consultants

**James Bret Michael.**   Currently an Associate Professor in the Computer Science Department of the Naval Postgraduate School. His research spans many areas of computer science, but much of his current effort is directed toward addressing challenges associated with computer security. For instance, Dr. Michael has been exploring ways to automate the task of reasoning about the security-related behavior of two types of composite systems: (i) those systems that are made up of both custom and commercial-off-the-shelf software and hardware and (ii) systems that cross jurisdictional or organizational boundaries (e.g., systems formed to support temporary coalitions of UN forces).   Dr. Michael has also held research positions with the Argonne National Laboratory, French National Institute for Transportation and Safety Research, Illinois Institute of Technology, and Institute for Defense Analyses.

Dr. Michael received a Ph.D. in computer science from George Mason University, Fairfax, Virginia.   He is a senior member of the Institute of Electrical and Electronics Engineers, Association for Computing Machinery and International Federation for Information Processing. Dr. Michael serves as a reviewer for several journals and he has co-authored three recent journal articles and a book on the topic of advanced vehicle control systems.

**Trusted Information Systems (TIS)** - As noted elsewhere in this proposal, we have had preliminary discussions with Trusted Information Systems regarding coordination and/or integration of NLP based work with their proposed effort, "Next Generation Facilities for Advanced Boundary Controllers". Brief biographies for TIS personnel that will be involved in the interaction between TextWise and TIS follow

Jeremy Epstein is a Principal Computer Scientist and manager of the Network Security Integration group at TIS. He has 20 years of experience in software engineering, including over ten years of experience in security engineering. Since joining TIS in 1997, he has made key contributions to the Information Assurance Integration program, leading TIS participation in the DARPA Information Assurance IFD and ISTI efforts. He currently leads the Prevent IPT under the Information Assurance Integration (IAI) program, which includes integration of other technologies into the ARGuE guard. Prior to joining TIS, major security-related projects include leading design and development of the Assure EC plug-in card that allows secure operation of insecure Windows-based software, leadership of the Novell NetWare C2 and F-C2 evaluations, leading design and development of the first high assurance windowing system (under DARPA sponsorship, while employed by TRW, Inc.), and leading development of a B1-targeted UNIX system. Mr. Epstein earned an MS in Computer Sciences from Purdue University and has completed his coursework for a Ph.D. in Information Security from George Mason University."

Brian Schechter is a Senior Software Engineer in the Network Security Integration group at TIS. He is currently leading development of the ARGuE advanced boundary controller, including CORBA IIOP protocol, intrusion detection, and digital signature. Prior to joining TIS, he worked for eight years at Raytheon Systems Corporation (formerly E-Systems) as a software lead on advanced airborne and ground reconnaissance programs. He earned an MS in Computer Science from Johns Hopkins University.


## L. MANAGEMENT APPROACH

Our proposed research project, GUARD-IT, represents a challenging research project but is at the same time a logical extension of past and current research activities within TextWise. Hence, we are in a unique position to offer a high level of program performance with a low level of

program risk. To ensure the success of the program TextWise has assembled a highly qualified technical team as well as a program management team. Dr. Elizabeth Liddy will provide overall program management and technical leadership in her role as Principal Investigator. Dr. Liddy has been the project lead on more than 25 funded research efforts and has an established track record of well managed and technically successful programs. The Project Manager, Woojin Paik, is the principal technical lead on TextWise's "KNOW-IT" program (part of DARPA's HPKB program) and is ideally situated in light of that experience to exercise day-to-day program execution responsibility for the GUARD-IT development effort. Program management support will be provided primarily by John Liddy (Director of Operations & Finance) and Paul Wilson (Contracts Manager). Mr. Liddy has been with the company since its inception and was instrumental in establishing a government audited and approved cost reporting and accounting system. Additionally, Mr. Liddy is currently in the process of implementing an Earned Value Management System (EVMS) that will be used to manage cost and schedule performance on all TextWise projects, including the proposed GUARD-IT system. Mr. Wilson has over sixteen years of R&D contracting experience in both government and industry positions.

Essential elements of our management approach are as follows:

(1) Organizational Structure. TextWise is a rapidly growing company devoted to the development of leading edge information technologies. Since its founding in 1993, TextWise has received over $6M in funding from a variety of sponsoring activities for research. The company is located in the Science & Technology Center on the campus of Syracuse University. TextWise currently has 30 employees, including 18 with advanced degrees in their field, organized in multiple project teams. Each team is assigned a senior technical lead that exercises both technical and working level project management responsibilities for the assigned project.

(2) Project Management. A master project schedule derived from individual SOW task requirements will be the basis for all project planning and management. The master project schedule will be used to track and validate technical progress and provide data on actual versus planned performance throughout contract performance. At project inception the master schedule is reviewed against all other projects schedules to identify and eliminate any resource requirement conflicts between projects. Milestone schedules and resource requirements (drafted during the proposal preparation process) are finalized and form the basis for a weekly project

Use or Disclosure of proposal data is subject to the restrictions on the cover page

team meeting and review by the Project Manager. The progress of all projects is reviewed regularly as part of the bi-weekly company project management meeting. A project progress indicator calculated on the basis of planned versus actual performance (both cost and schedule) is presented at the meeting.

(3) Project Interface and Communication. In addition to regular technical reports and integration meetings required as part of this project, we will be establishing a dedicated GUARD-IT website to exchange information and provide real-time access to project developments. The GUARD-IT website will allow government personnel to view project progress in concrete terms, rather than a simple description in a monthly status report. The website will also serve as a vehicle for sharing challenges and results with other researchers in the Information Assurance program.

(4) Risk Management. After adequate project controls and reviews (described above), the single greatest risk in the management of research efforts is the selection and continued motivation of a team of superior researchers. We believe we have assembled such a team for the GUARD-IT project. To ensure the establishment and continuation of the necessary 'team dynamic", project initiation is accompanied by a mini "Cards on the Wall" session attended by all project personnel. This exercise ensures that all project members understand the overall project, their role in the project, and the role of every other member of the team. Additionally, team member's annual evaluations expressly address project team performance as part of the evaluation process. To enhance the value of this process we have proposed a Cost Plus Award Fee contract type and anticipate "flowing down" the award fee process to the team level to provide a direct financial incentive for exceptional performance.

## M.  GOVERNMENT FURNISHED PROPERTY

Our proposal does not require the use of any Government Furnished Property (GFP).

## N.  PROPRIETARY CLAIMS

The proposed GUARD-IT system will be, in large part, a government funded research and development effort and as such all data as well as prototype tools developed will be delivered

Use or Disclosure of proposal data is subject to the restrictions on the cover page

will Unlimited Rights in accordance with applicable DoD guidance on rights in technical data and computer software.  However, some portions of the proposed development effort represent extensions of previously developed technology and as such are subject to other than unlimited rights.  Technology contemplated for inclusion in GUARD-IT that is subject to other than unlimited rights consists of:

| Technical Data & Computer Software: | Limitations: |
|---|---|
| KNOW-IT System components | SBIR Rights |
|     CRC Extractor | |
|     CRC Extraction Rule Applier | |
| DR-LINK Components | Commercial Software |

We do not anticipate any difficulties in providing the proposed deliverables in a form suitable for use by other technology developers and integration contractors.  Furthermore, our commercial affiliate, Manning & Napier Information Services (MNIS), has an interest in, and extensive experience with, independent commercialization and/or licensing of the products of TextWise research.  Hence, there is a clear and established path from TextWise research to the COTS marketplace.

**Use or Disclosure of proposal data is subject to the restrictions on the cover page**

04/17/2002  10:30   3154269123              MNIS  TEXTWISE                   PAGE  03
FEB-24-97 MON 14:21   MANNING & NAPIER        FAX NO. 7103255143            P. 02

## AMENDED EMPLOYMENT AGREEMENT

AGREEMENT made by and between TextWise Company, L.L.C., 2-212 Center for Science and Technology, Syracuse University, Syracuse, New York  13244-4100 (the "Company") and Elizabeth D. Liddy, 2-212 Center for Science and Technology, Syracuse University, Syracuse, New York 13244 ("Employee").

1.     Employment.  The Company hereby employs Employee and Employee hereby accepts employment with the Company upon the terms and conditions hereinafter set forth.

2.     Duties.

(a)     Employee shall be the President and Chief Executive Officer of the Company and shall perform the customary duties of such position and such other commensurate duties as may be assigned from time to time by the Members of the Company.  Employee agrees to abide by the reasonable rules, regulations, instructions, personnel practices, employment manuals and policies of the Company, as they may exist or be modified from time to time by the Company and as they apply to all executive employees of the Company, to the extent they do not contradict the express terms of this Agreement. The Company and Employee agree and understand that Employee's service as President is subject to approval by the Company's Members and that Employee shall hold such office only at the pleasure of the Members.

(b)     Employee shall devote sufficient working time and attention and best efforts to the business of the Company to perform her obligations hereunder.  Employee shall perform Employee's duties in a diligent, effective and loyal manner.  Under no circumstances shall Employee take any action contrary to the best interests of the Company or its parent, Manning & Napier Information Systems, L.L.C. ("MNIS").  Notwithstanding the foregoing, Employee may continue to perform services for Syracuse University or any other educational institution, and nothing contained in this Agreement shall be construed so as to limit her ability to do so; provided that none of the services performed by her shall inure to the benefit of any competitor or potential competitor of the Company or MNIS by providing it with technology or products which are competitive with technology or products which Employee knows or should know have been, are being or are being contemplated to be

developed or marketed by the Company or MNIS, at the time such services are commenced. Employee shall disclose each development activity, research grant and other similar activity In which she proposes to engage on behalf of Syracuse University or any other educational Institution during the term of this Agreement to Employer not less than ten (10) business days before the earlier of beginning to engaging In such activity or entering Into any commitment to do so. Employee shall not engage In any other business activity, whether as an employee, officer, director, shareholder, partner, consultant or for her own account, without the prior approval of the Company's Members; provided, however, that Employee may make passive investments representing an ownership interest of less than ten percent (10%) In (xx) any company (Including an open-ended Investment company) which has a market capitalization of not less than One Billion Dollars or (yy) any other company, provided that In the case of any such other company which Is or could be deemed to be in competition with the Company or MNIS, such investments such investments shall be made only with the prior written consent of Manning & Napier Associates, L.L.C. ("Associates"), which consent shall not be unreasonably withheld or delayed.  All of employee's current activities and obligations, Including those on behalf of Syracuse University, are set forth on Schedule 2(b) and are deemed approved.  Employee shall not be required to render any substantial portion of her duties at any location other than in Syracuse, New York.

     3.    Compensation.  Employee shall be compensated by the Company for all services to be rendered by her pursuant to this Agreement, as follows:

     (a)    The Company shall pay Employee a base salary at the rate of not less than Eighty-Five Thousand Dollars ($85,000.00) per year (the "Base Salary"). The Base Salary shall be paid In accordance with the normal payroll practices of the Company, but not less frequently than bi-weekly.  The Company shall review the Base Salary at least annually. In the event Employee shall render services to TextWise Corp. ("TextWise"), one of the Owners of the Company, the compensation (salary and bonus) payable to Employee by the Company shall be reduced by the amount of all compensation (including salary, bonus and benefits) paid to Employee by TextWise, such reduction to be deducted from the salary or other payment or payments due Employee next succeeding the receipt by her of such compensation from TextWise.

     (b)    The Company shall also pay Employee an annual bonus such that the total annual bonuses payable with respect to any fiscal year to·Employee and other

key employees of the Company who are engaged in performing Approved Activities (as hereinafter defined) (the identities of such other employees and the amounts of the bonuses payable to them to be determined by the Members of the Company, after consultation with Employee) shall equal ten percent (10%) of the net profit before interest and taxes earned by the Company from "Approved Activities", which shall mean (i) research and development activities performed by TextWise LLC for agencies of the United States government (provided that such activities were approved in writing, in advance, by Associates), and (ii) research and development activities performed by TextWise LLC for other parties (provided that such parties were approved in writing, in advance, by Associates) (it being understood that Associates may withhold its approval of such activities or parties for any reason or for no reason, in its sole discretion).  The net profit earned by the Company shall be determined based upon the cost of rendering such services as determined by the accountants regularly serving the Company, and otherwise in accordance with generally accepted accounting principles consistently applied.

     4.    Benefits.  Employee shall be entitled to receive the following benefits:

     (a)    Three (3) weeks of paid vacation per year of this Agreement or such greater period as may be approved from time to time by the Company's Members.

     (b)    Paid holidays as customarily provided to the Company's other executive employees.

     (c)    Such life insurance as the Company may determine: provided that the Company shall be the owner of any such policy and shall be entitled to all benefits thereunder, except for any amount paid as a death benefit, which amount shall be payable to any beneficiary designated by Employee.  In the event of any termination of Employee, Employee shall be entitled to purchase such insurance policy upon payment to the Company of the cash surrender value of such policy, if any.

     (d)    Such group health insurance, including medical and/or dental coverage, as may be provided by the Company to its other executive employees.

     (e)    Long term disability insurance coverage, at the same percentage of her salary as may be provided by the Company to its other executive employees.

     (f)    Participation in accordance with their terms of any pension, profit-sharing or retirement plans now existing or hereafter established by the Company and made generally available for its executive employees.

(g)   Participation in accordance with their terms in such other employee benefit plans now existing or hereafter established by the Company and made generally available for its executive employees

(h)   Reimbursement for all reasonable expenses incurred by Employee during the term of this Agreement for advancing the Company's business in accordance with Company policies upon Employee's presentation, from time to time, of an itemized account and evidence and explanation reasonably satisfactory to the Company of such expenses.

Subject to the financial condition and performance of the Company, it is intended that the benefits provided to Employee shall be comparable to the benefits provided to executive employees of MNIS performing functions similar to those performed by Employee.

Employee's eligibility for any benefit provided herein shall be subject to Employee's compliance with the reasonable requests of, and to Employee's meeting on an unrated basis the underwriting criteria used by, any insurance company providing any of the benefits specified herein to the Company's employees.  Employee agrees to submit to any medical examination and to provide and complete any documentation (including medical records) required by any such insurance company.  All benefits provided for hereunder are taxable to Employee to the extent required by applicable tax laws.

5.   Term of Employment.  Employee shall be an "at will" employee of the Company, and her employment may be terminated by the Members of the Company effective upon the giving of notice, with or without cause.  In the event of such termination, the Company shall continue to pay Employee the same salary and provide Employee with the same benefits as Employee was receiving on the date of termination, for a period of six (6) months following the effective date of such termination; provided, however, that (a) Employee shall be entitled to receive only such bonuses as were actually earned prior to the effective date of such termination; (b) if Employee's employment with the Company is terminated because Employee becomes disabled, and such disability, physical or mental, renders her unable to render full-time services to the Company as required pursuant to this Agreement, the amount which the Company shall be obligated to pay Employee shall be reduced by the amount of any benefits Employee is entitled to receive during such six (6) month period under any policy of disability insurance procured and paid for by the Company;

4

and (c) such salary and benefits shall terminate upon the effective date of such termination if such termination occurs as a result of any of the following events:

(I)    If Employee engages in willful misconduct with respect to the Company, or willfully and repeatedly neglects her duties to the Company; or

(ii)   If Employee engages in intentional dishonesty or steals any of the Company's property (including but not limited to intellectual property); or

(III)  Employee's death.

6.    <u>Non-Disclosure; Non-Competition</u>

(a)    <u>Proprietary Information</u>.  Employee will not, during the period of Employee's employment with the Company or at any time thereafter, regardless of the reason for the cessation of Employee's employment: (i) use any Confidential Information for Employee's own benefit or for the benefit of any person or entity other than the Company; (ii) disclose to any person or entity any Confidential Information; or (iii) remove from the Company's premises or make copies of any Confidential Information, in any form; except, in each case, as may be required within the scope of Employee's duties during Employee's employment by the Company.

Upon termination of Employee's employment, or at any such time as the Company may request, Employee will deliver to the Company all copies in Employee's possession of any Confidential Information, in any form.  Employee will not at any time assert any rights as against the Company in or with respect to any Confidential Information.

For purposes of this Agreement, "Confidential Information" means any and all technical, research, operational, manufacturing, marketing, sales and financial information, customer lists and trade secrets of the Company or MNIS or any of their respective affiliates, or of any vendor, supplier, distributor or customer of the Company or MNIS, regardless of how acquired or developed by the Company, MNIS or any such vendor, supplier, distributor or customer, concerning any of their respective businesses. Confidential Information does not include information, knowledge or data which Employee can prove(i) (a) was received from a source other than the Company, MNIS, TextWise Company, Inc., Associates, Syracuse University, or any customer or supplier of any of them, and (b) was in Employee's possession prior to the commencement of Employee's employment with the Company, (ii) was deemed by the disclosing party not to be confidential

information when disclosed, or (iii) was or is in the public domain by reason other than the wrongful acts of Employee.

(b)   Non-Competition.  During the period of Employee's employment with the Company and for a period of three (3) years thereafter, Employee will not, directly or indirectly, on Employee's behalf or on behalf of any other person or entity, in any way, whether as an individual proprietor, partner, stockholder, officer, employee, consultant, director, joint venturer, investor, lender, or in any other capacity, compete with the business then done or which Employee is aware at the time she terminates her employment with the Company is intended to be done by the Company and MNIS, including the development of products which are competitive with those developed and licensed or sold by the Company, nor will she assist any third person to so compete.   Employee acknowledges that her knowledge of the Company's products and technology is such that her employment by a competitor of the Company would inevitably result in the disclosure of the Company's Confidential Information, and that the covenant against competition contained in this paragraph is therefore reasonable.   Nothing contained herein shall be construed as preventing Employee from making Investments representing an ownership interest of less than ten percent (10%) in (xx) any company (including an open-ended investment company) which has a market capitalization of not less than One Billion Dollars or (yy) any other company, provided that in the case of any such other company which is or could be deemed to be in competition with the Company or MNIS, such investments such investments shall be made only with the prior written consent of Manning & Napier Associates, L.L.C. ("Associates").  In order to enable the Company and Associates to assure themselves that Employee has complied with the provisions of this paragraph, during the period set forth in the first sentence of this paragraph 7(b), Employee shall promptly notify the Company, MNIS and Associates after commencing to engage in any business activity, whether as a partner, owner, officer, director, consultant or otherwise.

If any restriction set forth in this paragraph is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable, it being understood and agreed that by the execution

of this Agreement, the parties hereto regard the restrictions herein as reasonable and compatible with their respective rights.

(c)    Developments.    Employee agrees that all products, processes, know-how, inventions or devices, or any improvements to any of the foregoing whether patentable or not ("inventions"), discovered or developed by Employee or other employees of the Company during the course of her employment with the Company which are (i) related to the business of the Company or MNIS (other than those inventions made during the course of her employment by Syracuse University or any other educational institution; so long as those inventions do not inure to the benefit of any competitor or potential competitor of the Company or MNIS by providing it with technology or products which are competitive with technology or products which Employee knows or should know have been, are being or are being contemplated to be developed or marketed by the Company or MNIS, at the time such services are commenced); or (ii) in the course of development by the Company (other than those inventions made during the course of her employment by Syracuse University or any other educational institution, so long as those inventions do not inure to the benefit of any competitor or potential competitor of the Company or MNIS by providing it with technology or products which are competitive with technology or products which Employee knows or should know have been, are being or are being contemplated to be developed or marketed by the Company or MNIS, at the time such services are commenced); or (iii) made with the use of the Company's time, materials, equipment or facilities, shall belong to the Company. Employee hereby assigns and transfers to the Company all right, title and interest to any and all such inventions.    Employee agrees promptly to execute such instruments and assignments and to take all such other action, at the Company's expense, as may be necessary or desirable to vest title in such inventions to the Company or to obtain letters patent and copyrights for the benefit of the Company.    The provisions of the two immediately preceding sentences shall not apply to any products, processes, know-how, inventions or devices, or any improvements to any of the foregoing, if they are (x) made solely by any student under Employee's supervision who has not, at any time (i) been paid by, or received any remuneration from, the Company or MNIS or (ii) used any of the Company's or MNIS' time, materials, equipment or facilities, and (y) Employee does not have or have any right to receive any economic interest in or benefit from such products, processes, know-how,

Inventions, devices or improvements.   Employee agrees promptly to disclose to the Company all inventions of any nature made by Employee during the term of this Agreement.

(d)   Injunctive Relief.   In the event of a breach or threatened breach of any of the terms of this Agreement, the Company shall be entitled to an injunction restraining Employee from committing any breach of this Agreement without showing or proving any actual damages and without diminishing any other right or remedy which the Company may have at law or in equity to enforce the provisions of this Agreement. Employee shall reimburse the Company on demand for all costs and expenses, including reasonable attorneys' fees, incurred by the Company in successfully enforcing any of its rights under this paragraph 7(d).  In the event that the Company seeks to enforce its rights under this paragraph 7(d) and is found by a court not to be entitled to such relief, Employee shall be entitled to recover from the Company her attorneys' fees and costs incurred in opposing such legal action.

7.   General Terms.

(a)   Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, their personal representatives, and permitted successors and assigns.

(b)   Assignment.  This Agreement may not be assigned, in whole or in part, by any party hereto without the prior written consent of all other parties.

(c)   Entire Agreement.   This Agreement contains the entire understanding between or among the parties hereto and supersedes any prior understanding, memoranda or other written or oral agreements between or among any of them respecting the subject matter of this Agreement.   There are no representations, agreements, arrangements or understandings, oral or written, between or among any of the parties relating to the subject matter of this Agreement which are not fully expressed herein or in the following documents:   An Amended Operating Agreement of Employer; an Amended Operating Agreement of MNIS, an Owners Agreement among Associates, TextWise Company, Inc. ("TextWise") Employee and Michael L. Welner ("Welner"); and a Supplemental Agreement among Employer, Employee, TextWise, Associates and Weiner, each of which is dated the same date as the date hereof.  This Agreement supersedes in its entirety the Employment Agreement between Employee and TextWise Company, L.L.C. dated as of January 31, 1995, which is terminated effective on and as of the date hereof.

 

 

(d)   Modifications; Waiver.   No modification or waiver of this Agreement or any part hereof shall be effective unless in writing and signed by the party or parties sought to be charged therewith.   No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach or condition, whether of like or different nature.   No waiver of any breach or condition of this Agreement by or with respect to any party hereto shall be deemed to be a waiver of the same breach or condition with respect to any other party hereto.   No course of dealing between or among any of the parties hereto will be deemed effective to modify, amend or discharge any part of this Agreement or the rights or obligations of any party hereunder.

(e)   No Third Party Beneficiary.   None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any person or entity not a  party hereto.

(f)   Partial Invalidity.   If any provision of this Agreement shall be held invalid or unenforceable by competent authority, such provision shall be construed so as to be limited or reduced to be enforceable to the maximum extent compatible with the law as it shall then appear.   The total invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(g)   Notices.   Any notice or other communication required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given (i) upon hand delivery, (ii) when telecopied or sent by facsimile transmission if, in either case, an additional notice is given within three (3) days by delivery to the U.S. Postal Service as certified or registered mail, return receipt requested and postage prepaid or (iii) on the first day following delivery to a nationally recognized United States overnight courier service, fee prepaid, return receipt or other confirmation of delivery requested, to the address as shown from time to time on the records of the Company. Any such notice or communication shall be delivered or directed to a party at its address set forth below or at such other address as may be designated by a party in a notice given to all other parties hereto in accordance with the provisions of this paragraph.

Notice to the Company          TextWise Company, L.L.C.
shall be sent to:              2-212 Center for Science and Technology
                              Syracuse University

04/17/2002  10:30     3154269123 ·            MNIS TEXTWISE                    PAGE  12
. FEB-24-97 MON 14:34    MANNING & NAPIER          FAX NO. 7163255143              P. 11

                          Syracuse, New York 13244

with a copy to:           Devorsetz, Stenziano, Gilberti, Hertz & Smith, P.C.
                          Bridgewater Place
                          500 Plum Street, Suite 600
                          Syracuse, New York 13204-1428
                          Attn: Lynn H. Smith, Esq.

Notice to Employee        2-212 Center for Science and Technology
shall be sent to:         Syracuse University
                          Syracuse, New York 13244

with a copy to:           Devorsetz, Stenziano, Gilberti, Hertz & Smith, P.C.
                          Bridgewater Place
                          500 Plum Street, Suite 600
                          Syracuse, New York 13204-1428
                          Attn: Lynn H. Smith, Esq.

Copies of all notices     Manning & Napier Associates, L.L.C.
Shall be sent to:         1100 Chase Square
                          Rochester, New York 14604
                          Attn: William Manning
                              B. Reuben Auspitz

and to:                   Underberg & Kessler LLP
                          1800 Chase Square
                          Rochester, New York 14604
                          Attn: Robert F. Mechur, Esq.

and to:                   Harris, Beach & Wilcox
                          130 East Main Street
                          Rochester, New York 14604
                          Attn: Patrick J. Dalton, Esq.

   (h)    Governing Law.  This Agreement shall be governed by, and

construed in accordance with, the laws of the State of New York pertaining to contracts made

and to be wholly performed within such state, without taking into account conflicts of laws

principles.

   (i)    Jurisdiction and Venue.  In the event that any legal proceedings

are commenced in any court with respect to any matter arising under this Agreement, the

parties hereto specifically consent and agree that:

        (i)    the courts of the State of New York and/or the United

States Federal Courts located in the State of New York shall have exclusive

jurisdiction over each of the parties hereto and over the subject matter of any such proceedings; and

(ii)    the venue of any such action shall be In Monroe County, New York, Onondaga County, New York and/or the United States District Court for the Western District of New York.

(j)    Headings.   The headings contained in this Agreement are Inserted for convenience only and do not constitute a part of this Agreement.

(k)    Fair Meaning. This Agreement shall be construed according to its fair meaning, the language used shall be deemed the language chosen by the parties hereto to express their mutual intent, and no presumption or rule of strict construction will be applied against any party hereto.

(l)    Counterparts.   This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of said counterparts together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of December 31, 1996.

COMPANY:

TEXTWISE COMPANY, L.L.C.

By: _____

EMPLOYEE:

Elizabeth D. Liddy

TOWNSEND
*and*
TOWNSEND
*and*
CREW
LLP

Palo Alto, California
Tel 650 326

Denver, Colorado
Tel 303 571-4000

Walnut Creek, California
Tel 925 472-5000

Seattle, Washington
Tel 206 467-9600

San Francisco

Two Embarcadero Center
8th Floor
San Francisco
California 94111-3834
Tel 415 576-0200
Fax 415 576-0300

Direct (415) 273-7564
fdnwamu@townsend.com

October 11, 2002

*VIA FEDEX*
Elizabeth D. Liddy
104 Victoria Place
Syracuse, NY  13210

Re:   US Patent Application No. 10/137,740
      For: TECHNIQUES FOR CONTROLLING DISTRIBUTION OF INFORMATION
      FROM A SECURE DOMAIN
      Filed:  April 30, 2002
      Our File No.:  017704-001012US

Dear Elizabeth:

Enclosed please find a copy of the above-referenced application, as filed with the U.S. Patent and Trademark Office, and a Declaration and Assignment for execution.  On several occasions, these documents were previously provided, but you refused to sign them.  For example, the documents were sent to you on or around November 21, 2001 for execution, at which time you indicated your refusal to sign.

Please let us know by **October 21, 2002** if you will be signing the Declaration and Assignment. If we do not hear from you by that date we will file a Rule 1.47 Petition instead.

If you have any questions, please call me.

Very truly yours,

Fidel D. Nwamu

FDN/kk
Enclosures:  copy of application as filed, Declaration, Assignment
cc:    Michael Weiner w/out enclosures; Sujit Kotwal; David Slone; Charlie Kulas
SF 1395423 v1



**UNITED STATES PATENT AND TRADEMARK OFFICE**

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

| APPLICATION NUMBER | FILING/RECEIPT DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NUMBER |
|---|---|---|---|
| 10/137,740 | 04/30/2002 | Elizabeth D. Liddy | 017704-001012US |

**CONFIRMATION NO. 4159**

20350
TOWNSEND AND TOWNSEND AND CREW, LLP
TWO EMBARCADERO CENTER
EIGHTH FLOOR
SAN FRANCISCO, CA 94111-3834

**FORMALITIES LETTER**

*OC000000008227516*

Date Mailed: 06/04/2002

## NOTICE TO FILE MISSING PARTS OF NONPROVISIONAL APPLICATION

### FILED UNDER 37 CFR 1.53(b)

#### *Filing Date Granted*

**Items Required To Avoid Abandonment:**

An application number and filing date have been accorded to this application. The item(s) indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The statutory basic filing fee is missing.
  *Applicant must submit $ 370 to complete the basic filing fee for a small entity.*
- The oath or declaration is unsigned.
- To avoid abandonment, a late filing fee or oath or declaration surcharge as set forth in 37 CFR 1.16(l) of $65 for a small entity in compliance with 37 CFR 1.27, must be submitted with the missing items identified in this letter.

**Items Required To Avoid Processing Delays:**

The item(s) indicated below are also required and should be submitted with any reply to this notice to avoid further processing delays.

- Additional claim fees of $357 as a small entity, including any required multiple dependent claim fee, are required. Applicant must submit the additional claim fees or cancel the additional claims for which fees are due.

**SUMMARY OF FEES DUE:**

Total additional fee(s) required for this application is $792 for a Small Entity

- $370 Statutory basic filing fee.
- $65 Late oath or declaration Surcharge.
- Total additional claim fee(s) for this application is $357

- **$315** for **35** total claims over 20.
- **$42** for **1** independent claims over 3.

---

*A copy of this notice <u>MUST</u> be returned with the reply.*

Customer Service Center
Initial Patent Examination Division (703) 308-1202

PART 2 - COPY TO BE RETURNED WITH RESPONSE